**[J-29-2017]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | |
|---|---|
| JOSEPH B. SCARNATI, SENATOR AND PRESIDENT PRO TEMPORE OF THE SENATE OF PENNSYLVANIA; JAKE CORMAN, SENATOR AND MAJORITY LEADER OF THE SENATE OF PENNSYLVANIA; JAY COSTA, SENATOR AND MINORITY LEADER OF THE SENATE OF PENNSYLVANIA, | No. 3 MAP 2016<br><br>Appeal from the Order of the Commonwealth Court at No. 579 MD 2014, dated December 30, 2015 (finalized on January 29, 2016).<br><br>ARGUED: May 9, 2017 |
| Appellants | |
| v. | |
| TOM WOLF, GOVERNOR OF PENNSYLVANIA; RANDY ALBRIGHT, SECRETARY OF THE BUDGET; TIMOTHY A. REESE, STATE TREASURER OF PENNSYLVANIA; DENNIS M. DAVIN, SECRETARY OF COMMUNITY AND ECONOMIC DEVELOPMENT; CINDY ADAMS DUNN, SECRETARY OF CONSERVATION AND NATURAL RESOURCES; JOHN H. QUIGLEY, SECRETARY OF ENVIRONMENTAL PROTECTION; CURTIS M. TOPPER, SECRETARY OF GENERAL SERVICES; KATHY MANDERINO, SECRETARY OF LABOR & INDUSTRY; MAJOR GENERAL JAMES R. JOSEPH, ADJUTANT GENERAL OF PENNSYLVANIA; JOSH SHAPIRO, CHAIRMAN OF THE PENNSYLVANIA COMMISSION ON CRIME AND DELINQUENCY, | |
| Appellees | |

**JUSTICE WECHT**                                    **DECIDED: November 22, 2017**

In a petition for review filed in the Commonwealth Court's original jurisdiction, a group of state senators ("the Senators") challenged as unconstitutional the Governor's partial disapproval of the General Appropriations Act of 2014 ("GAA")[1] and the 2014 Fiscal Code Amendments ("FCA").[2]  The Commonwealth Court denied the Senators' request for summary relief.  We agree with the Senators that the Governor's attempted partial vetoes of the proposed legislation failed to adhere to the requirements of Article IV, Section 15, of the Pennsylvania Constitution.   We therefore reverse the Commonwealth Court's decision denying the Senators summary relief on Count I of their petition for review.

## I.    Background

The GAA and the FCA originated in the Pennsylvania House of Representatives and ultimately passed both legislative chambers.  On July 1, 2014, the General Assembly presented the GAA to former Governor Tom Corbett for his consideration. On July 9, 2014, the lawmakers similarly presented the FCA to the Governor for his consideration.  The House of Representatives adjourned that same day.[3]

---

[1]      H.B. 2328, 2014 sess. (Pa. 2014).

[2]      H.B. 278, 2014 sess. (Pa. 2014).

[3]      The Legislative Journal reflects that the House adjourned on July 9, 2014, and reconvened on July 29, 2014.  *2014 Pa. Legislative Journal—House* 1234 (July 9, 2014), Reproduced Record ("R.R.") 609a (noting that the House agreed to adjourn until August 4, 2014, unless sooner recalled by the Speaker of the House); *2014 Pa. Legislative Journal—House* 1235 (July 29, 2014), R.R. 611a (reconvening).

We take judicial notice that the Legislative Journal also reflects that the Senate was not in session from July 8, 2014, through September 15, 2014.  *2014 Pa. Legislative Journal—Senate* 2124 (July 8, 2014), (continued…)

The following day, July 10, 2014, the Governor approved in part and disapproved in part the GAA and the FCA, utilizing the line-item veto. *See* PA. CONST. art. IV, § 16. The Governor's partial disapproval of the GAA, *inter alia*, reduced the amount appropriated to the Senate for various expenses, including: salaries and personal expenses of Senate employees; expenses of the office of the President *Pro Tempore* of the Senate; Senate expenses for lodging, meals, and incidentals; items such as furniture and technology upgrades; and the amount available for the caucus operations account. In addition, the Governor reduced the appropriation for "Heritage and Other Parks" by $500,000. Petition for Review, Reproduced Record ("R.R.") at 279a.

With regard to the FCA, the Governor completely disapproved of seven provisions that corresponded with the disapproved portions of the GAA. These included Section 1724-J, which transferred funds from the Department of General Services to the legislative branch for distribution upon approval by the President *Pro Tempore* of the Senate, the Majority Leader of the Senate, the Speaker of the House, and the Majority Leader of the House. The Governor also disapproved of Section 1720-J of the FCA, which provided that, from funds appropriated for Heritage and other parks, $500,000 "shall be used for the operation and maintenance of the Washington Crossing Historical Park," R.R. 21a, and Section 1716-J, which directed the allocation of funds to pay dues "for fiscal years 2013-2014 and 2014-2015 to a commission of the Atlantic coastal states that coordinates the conservation and management of near-shore fish species." *Id.* at 20a.

---

(…continued)
http://www.legis.state.pa.us/WU01/LI/SJ/2014/0/Sj20140708.pdf (last viewed June 30, 2017) (noting that the Senate agreed not to be in session until September 15, 2014, unless recalled sooner); *2014 Pa. Legislative Journal—Senate* 2125 (Sept. 15, 2014), http://www.legis.state.pa.us/WU01/LI/SJ/2014/0/Sj20140915.pdf (last viewed June 30, 2017) (reconvening).

On July 10, 2014, the Governor returned copies of the bills and the Governor's objections to the House Parliamentarian. The Governor also delivered the signed GAA and FCA, together with his line-item vetoes and several copies, to the Secretary of the Commonwealth, and asked the Secretary to assign act numbers to the bills and to retain the copies. The Secretary complied, assigning to the GAA the designation "Act No. 2014-1A" and to the FCA the designation "Act No. 2014-126." R.R. 18a.

Also on July 10, 2014, the Office of the Budget issued a press release announcing that the Governor had signed the GAA and FCA, and detailing the various line-item vetoes in each bill. R.R. 661-64. This press release was made publicly available on the Commonwealth's website. The House did not record the Governor's objections to the legislation in its journals and did not reconsider the GAA or the FCA. Instead, the General Assembly adjourned *sine die* on November 12, 2014, and took no further action on either bill.[4]

On November 4, 2014, the Senators filed a petition for review ("PFR") against the Governor and various executive-branch officials (collectively, "the Governor") in the Commonwealth Court.[5] On March 9, 2015, the Senators sought declaratory and injunctive relief, challenging the constitutionality of the Governor's line-item vetoes of the GAA and FCA. A brief review of the relevant provisions of the Pennsylvania Constitution will aid in understanding the parties' respective positions.

---

[4] An adjournment *sine die* "end[s] a deliberative assembly's or court's session without setting a time to reconvene." *Scarnati v. Wolf*, 135 A.3d 200, 205 n.7 (Pa. Cmwlth. 2015) (citing BLACK'S LAW DICTIONARY 44 (8th ed. 2004)).

[5] This action was filed by Senators Joseph Scarnati, Dominic Pileggi, and Jay Costa, against former Governor Tom Corbett, former Budget Secretary Charles Zogby, and former State Treasurer Robert McCord, *et al.* Following the November 2014 election and the January 2015 commencement of Governor Wolf's administration, the representative parties were changed where appropriate. *See* Pa.R.A.P. 502(c).

A general appropriation bill is one of the exceptions to the single subject rule of Article III, Section 3. That section provides: "No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof." PA. CONST. art. III, § 3. This exception is limited by the Constitution, which restricts the scope of a general appropriation bill as follows: "The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject." *Id.* art. III, § 11. Article III, Section 24 provides that:

> No money shall be paid out of the treasury, except on appropriations made by law and on warrant issued by the proper officers; but cash refunds of taxes, licenses, fees and other charges paid or collected, but not legally due, may be paid, as provided by law, without appropriation from the fund into which they were paid on warrant of the proper officer.

*Id.* art III, § 24.

The Governor's veto authority is provided in Article IV, Sections 15 and 16 of the Pennsylvania Constitution. Section 15 sets forth the procedure by which the Governor vetoes a bill, while Section 16 establishes the Governor's line-item veto power. These sections provide:

> § 15. Approval of bills; Vetoes
>
> Every bill which shall have passed both Houses shall be presented to the Governor; if he approves he shall sign it, but if he shall not approve he shall return it with his objections to the House in which it shall have originated, which House shall enter the objections at large upon their journal, and proceed to re-consider it. If after such re-consideration, two-thirds of all the members elected to that House shall agree to pass the bill, it shall be sent with the objections to the other House by which likewise it shall be re-considered, and if approved by two-thirds of all the members elected to that House it shall be a law; but in such cases the votes of both Houses shall be determined by yeas and nays, and the names of the

members voting for and against the bill shall be entered on the journals of each House, respectively. If any bill shall not be returned by the Governor within ten days after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the General Assembly, by their adjournment, prevent its return, in which case it shall be a law, unless he shall file the same, with his objections, in the office of the Secretary of the Commonwealth, and give notice thereof by public proclamation within thirty days after such adjournment.

§ 16. Partial Disapproval of Appropriation Bills

The Governor shall have power to disapprove of any item or items of any bill, making appropriations of money, embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items of appropriation disapproved shall be void, unless re-passed according to the rules and limitations prescribed for the passage of other bills over the Executive veto.

*Id.* art. IV, §§ 15, 16.

In Count I of their PFR, the Senators alleged that the Governor's attempted line-item vetoes of portions of the GAA and FCA were invalid because the Governor did not follow the procedure established in Article IV, Section 15. The Senators' argument in this regard was twofold. First, the Senators claimed that, pursuant to Article IV, Section 15, the Governor was prevented from returning the bills to the House on July 10, 2014, because the House had adjourned on July 9, 2014. According to the Senators, this temporary adjournment prevented the effective return of the bills and objections. Second, the Senators asserted, because the House had adjourned on July 9, 2014, the Constitution required the Governor to follow the filing and proclamation procedure of Section 15, filing the bill and objections with the Secretary of the Commonwealth and giving notice thereof by "public proclamation." *Id.* art. IV, § 15. The Senators maintained that the Governor failed to provide notice by public proclamation, rendering the Governor's line-item vetoes invalid, and causing the GAA and the FCA to become law in the form submitted to the Governor.

In Count II of their PFR, the Senators alleged that the FCA was not subject to the Governor's line-item veto authority, which is limited to "any item or items" of a bill "making appropriations of money." PA. CONST. art. IV, § 16. The Senators argued that the veto power granted by Article III, Section 16 is limited to bills authorizing the release of money from the treasury, and cannot be extended to the corresponding fiscal code amendments, which address the allocation of monies that have already been appropriated from the treasury. According to the Senators, the FCA did not make appropriations of money, and the Governor therefore could only approve or disapprove of the FCA in its entirety, rendering his line-item vetoes of the FCA invalid. In their request for relief, the Senators sought, *inter alia*, a declaration that the Governor's disapprovals of provisions of the GAA and FCA were null and void, and a declaration that the GAA and the FCA, in their entirety, have become law.

The Senators filed an application for partial summary relief seeking judgment in their favor on Counts I and II of their PFR (asserting that the line-item vetoes of both bills were unconstitutional). The Governor filed an answer to the Senators' application for partial summary relief and preliminary objections seeking the dismissal of the PFR for lack of standing.[6]

Addressing the Senators' application for summary relief, the Governor asserted that the House's adjournment did not prevent the Governor from returning the vetoed bills to the House *via* the House Parliamentarian. The Governor characterized the return of the subject bills to the House Parliamentarian, whose office was open for

---

[6]     The Treasurer did not join in the Governor's preliminary objections, and instead separately filed an answer to the Senators' PFR.

business during the adjournment of the House, as consistent with accepted past practice. Arguing in the alternative, the Governor asserted that, if he was required to give notice of the veto by public proclamation due to the House's adjournment, *see* PA. CONST. art. IV, § 15, then the Governor's July 10, 2014 press release satisfied this requirement. In this respect, the Governor maintained that the Constitution does not specify the form or the substance of the public proclamation, leaving such details to the Governor's discretion. Regarding his line-item veto authority as to the FCA, the Governor argued that he may invoke this authority to veto portions of any bill that directs that a specific sum of money be spent for a particular purpose, including the FCA.

On December 30, 2015, the Commonwealth Court issued an opinion denying the Governor's preliminary objections and the Senators' application for summary relief. Addressing the Governor's preliminary objection premised upon the Senators' purported lack of standing, the court concluded that the Senators had alleged sufficient legislative interest to establish their standing to pursue this challenge to the Governor's vetoes. *Scarnati v. Wolf*, 135 A.3d 200, 210 (Pa. Cmwlth. 2015).[7]

Turning to the Senators' application for summary relief, and examining the veto return language of Article IV, Section 15, the Commonwealth Court observed that the provision speaks of an adjournment of the "General Assembly," not solely of the originating chamber, as the Senators would have it. *Id.* at 213. According to the Commonwealth Court, neither legislative chamber may, "without the consent of the other, adjourn for more than three days." PA. CONST. art. II, § 14. The court observed

---

[7] On appeal to this Court, the Governor has abandoned any challenge to the Senators' standing.

that consent for an adjournment in excess of three days is demonstrated by the adoption of a concurrent resolution. 101 Pa. Code §§ 7.24(a), (b). Finding that it was unable to conclude, upon the record before it, that the General Assembly had adjourned by concurrent resolution, the Commonwealth Court held that it was not clear whether a constitutionally sufficient adjournment occurred that could have prevented the Governor from returning the bills and his objections to the House. *Scarnati*, 135 A.3d at 215. The Commonwealth Court also addressed the Governor's contention that there is a long-standing practice of returning bills to the House Parliamentarian, and that an adjournment precludes return of a vetoed bill only when the office of the House Parliamentarian is closed. According to the Commonwealth Court, this question implicated facts averred but not of record. Thus, the court refused to address it. *Id.* at 214, n.20.

Assuming, *arguendo,* that there was an adjournment of the General Assembly that prevented the Governor's return of the bills with objections, the Commonwealth Court turned to the proclamation procedure required by Section 15. Specifically, the Commonwealth Court addressed whether the Governor's press release satisfied the requirement for notice by public proclamation. The Commonwealth Court held that a public proclamation is generally understood as providing public notice of governmental matters of importance, and held that the Governor's method of issuing a press release through the Office of the Budget and making it publicly available on the Commonwealth's website satisfied the constitutional requirement for notice by public proclamation. *Scarnati*, 135 A.3d at 217-18.

The Commonwealth Court next addressed the question of whether the FCA constitutes a "bill, making appropriations of money" for purposes of the line-item veto authorized by Article IV, Section 16. The Commonwealth Court agreed with the Governor that resolution of this question was controlled by our analysis in *Jubelirer v. Rendell*, 953 A.2d 514 (Pa. 2008), wherein this Court limited the items in an appropriation bill that could be subject to the Governor's line-item veto authority to "a sum of money directed by the General Assembly to be spent for a particular purpose." 953 A.2d at 534.

With this precedent in mind, the Commonwealth Court examined the nature of the Fiscal Code amendments. The Fiscal Code defines the powers and duties of the executive branch regarding the collection of all monies due to the Commonwealth and the "disbursement or other disposition of all funds" belonging to the Commonwealth. 72 P.S. § 2. According to the Commonwealth Court, the Governor historically has acted simultaneously upon general appropriation bills and the accompanying Fiscal Code amendments. *Scarnati*, 135 A.3d at 223. The Commonwealth Court considered the relationship between the GAA and the corresponding FCA to be interdependent, and observed that the Governor's disapprovals in the GAA and the FCA correlate. For instance, in Subsection 210(7) of the GAA, the Governor reduced the appropriation for Heritage and other parks by $500,000, and correspondingly disapproved of Section 1720-J of the FCA, which directed that $500,000 from funds appropriated to Heritage and other parks shall be used for Washington Crossing Historical Park. The Commonwealth Court found that similarly coordinated, symmetrical actions with regard to the line-item vetoes in the FCA served to keep an agency's or department's actions,

as funded by the GAA, within the confines of the appropriation. The Commonwealth Court therefore held that the Governor constitutionally had utilized the line-item veto to disapprove of portions of the FCA.

Consequently, the Commonwealth Court denied the Senators' application for summary relief. On January 29, 2016, at the parties' behest, the Commonwealth Court issued an order certifying that its December 30, 2015 order was final, and that an immediate appeal would facilitate resolution of the entire case. *See* Pa.R.A.P. 341(c).

On appeal, the Senators raise the following issues for our resolution:

1. Under Article IV, Section 15 of the Pennsylvania Constitution, when the Governor vetoes a bill and attempts to return it, with his objections, to the [h]ouse where it originated, which is adjourned, does the adjournment prevent the return of the bill?

2. When the Governor vetoes a bill and the [h]ouse where the bill originated, by its adjournment, prevents him from returning it, does he fail to comply with Article IV, Section 15's alternative procedure for his veto to become valid ("he shall file the [bill], with his objections, in the office of the Secretary of the Commonwealth, and give notice thereof by public proclamation within 30 days after such adjournment") when, instead of issuing a proclamation under his own signature and seal of the Commonwealth, a cabinet official's press office issues a press release in which it mentions the vetoes without stating that the bill and vetoes have been filed in the office of the Secretary of the Commonwealth?

3. Does Article IV, Section 16 of the Pennsylvania Constitution (giving the Governor line-item veto power for a bill "making appropriations of money") apply to a bill that directs how agencies that receive appropriations must spend the appropriated money, when those directives would have no effect if appropriations had not been made to the agencies by other legislation?

Brief for the Senators at 7-8.

The standard for granting summary relief turns upon whether the applicant's right to relief is clear.[8]  Summary relief on a petition for review is similar to the relief provided by a grant of summary judgment.  Pa.R.A.P. 1532, Official Note.  Summary judgment is appropriate where, after the close of pleadings, "there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report."  Pa.R.C.P. 1035.2(a).  The record is to be viewed in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.  *Albright v. Abington Mem. Hosp.,* 696 A.2d 1159, 1165 (Pa. 1996).  In reviewing the denial of summary relief, we may disturb the lower court's order only where there has been an error of law or a manifest abuse of discretion.  *Id.*  As to questions of law, "our standard of review is *de novo* and our scope of review is plenary." *Brittain v. Beard*, 974 A.2d 479, 483 (Pa. 2009).

The questions before us implicate: the constitutional requirements of the veto-return process of Article IV, Section 15, in circumstances where the originating chamber has adjourned; the constitutional requirements for the filing-and-proclamation procedure of Article IV, Section 15; and the line-item veto authority granted to the Governor by Article IV, Section 16.  The fundamental rule of constitutional construction is that "the Constitution's language controls and must be interpreted in its popular sense, as understood by the people when they voted on its adoption."  *Ieropoli v. AC&S Corp.*, 842 A.2d 919, 925 (Pa. 2004).  We are not to interpret the Constitution in a technical or

---

[8]    Rule 1532(b) provides that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear."  Pa.R.A.P. 1532(b).

strained manner, but are to interpret its words in their "popular, natural and ordinary meaning." *Commonwealth v. Harmon*, 366 A.2d 895, 897 (Pa. 1976). Moreover, "[w]e should also consider the circumstances attending its formation and the construction probably placed upon it by the people." *Id.* We have explained that, in interpreting our Constitution, we may consider existing decisional law under the provision, policy considerations, and, to the extent other states have identical or similar provisions, extra-jurisdictional case law. *Jubelirer*, 953 A.2d at 525 n.12.

## II.     Prevention of the veto return by an adjournment of the General Assembly

Resolving whether the House's adjournment prevented the Governor's return of the partially-vetoed bills requires us to construe the process in Article IV, Section 15 of the Pennsylvania Constitution for returning vetoed legislation during a legislative adjournment. According to the Senators, we should construe the language of this section to mean that an adjournment of the legislative chamber in which a bill originated will always defeat the Governor's attempted return of a bill, and will trigger the filing and proclamation procedure of Article IV, Section 15. When the members of a legislative body are adjourned, the Senators believe that the body ceases to exist for the transaction of official business, preventing the Governor's return of a vetoed bill to that adjourned chamber. Although there may be officers or employees who continue to work through an adjournment, the Senators argue that the Governor may not effectuate a veto return to such an officer or employee for the same reason: an adjourned legislative body is, by definition, always incapable of accepting the return of a vetoed bill. In advancing this argument, the Senators assert that Article IV, Section 15 is concerned

only with whether the chamber in which the bill originated has adjourned, not with whether both chambers of the General Assembly have adjourned.

Responding to this argument, the Governor does not offer any insight upon the question of how we might determine when an adjournment has occurred, or upon the issue of which legislative chamber (House, Senate, or both) we are to concern ourselves with when answering that question. Rather, it is the Governor's position that the issue of whether the chamber in which the bill originated has adjourned is simply irrelevant inasmuch as the Governor can return the bills with his objections to an agent or officer of that house. Return to the House Parliamentarian, according to the Governor, is the method by which the Governor has returned a bill to the originating chamber in accord with the long-standing practice of the executive and legislative branches. As support, the Governor relies upon an affidavit to that effect attested by Nicole Bordonaro, the Executive Deputy General Counsel for Legislation in the Office of General Counsel. R.R. 659a. The Governor views the record as clear that the Parliamentarian accepted the returned bills in keeping with this long-standing practice. The Governor believes that the filing and proclamation procedure is triggered only when there are no agents or officers of the originating chamber who are available to accept the Governor's return. Otherwise, adjourned or not, the Governor believes he may return a bill and his objections thereto to the House Parliamentarian. Because the Governor actually did so, he believes that it is unnecessary to engage in a hypothetical discussion of whether there was an adjournment that prevented his return of the bills.

Because the Commonwealth Court declined to resolve whether the House's adjournment prevented the Governor's return, and because the Commonwealth Court

found unresolved issues of fact that preclude this determination, the Governor believes that the first issue before us is not ripe for review. In particular, the Governor asserts that it cannot be determined, on this record, whether the House's adjournment was accomplished by concurrent resolution, or whether the practice of returning bills to the House Parliamentarian precludes the return of a vetoed bill only when the office of the House Parliamentarian is closed.

The text of Article IV, Section 15 controls the Governor's approval of a bill, the process by which he may veto and return a bill, and the alternative filing and proclamation procedure. After a bill passes both chambers, it is "presented to the Governor." PA. CONST. art IV, § 15. If the Governor approves the bill, "he shall sign it," *id.*, and the bill becomes law. If the Governor chooses instead not to approve the bill, the Governor must follow the veto return process. That is, if the Governor "shall not approve he shall return [the bill] with his objections to the House in which [the bill] shall have originated." *Id.* The originating chamber shall enter the Governor's objections "at large upon their journal, and proceed to re-consider it." *Id.* If two thirds of the members of the originating chamber agree to pass the bill over the Governor's objections, the bill is sent, with the Governor's objections, to the other chamber for reconsideration. *Id.* If two thirds of the members of that chamber likewise approve the bill, the Governor's veto is overridden, and the bill becomes law. *Id.* The votes of members of both chambers "shall be entered on the journals of each House, respectively." *Id.* If the Governor does not return a bill "within ten days after it shall have been presented to him, the same shall be a law in like manner as if he had signed it." *Id.* However, if "the General Assembly, by their adjournment" prevents the bill's return, "[the bill] shall be a law," unless the

Governor follows the filing and proclamation procedure, discussed more thoroughly in connection with the next issue.[9]

By conferring upon the Governor the authority to nullify legislation that has passed both legislative houses, Section 15 entrusts him with the obligation both to examine the provisions of the legislation within the ten days allotted by Section 15 and to either approve it or return it, disapproved, for legislative reconsideration. Disapproval requires the Governor to furnish the legislature with his specific objections in order to enable the legislature to fulfill its reciprocal obligations to record the Governor's objections upon the legislative journal and reconsider the bill. This procedure is enshrined in our organic charter, and ensures that the legislature and the public receive notice of the Governor's veto and the resulting status of the legislation. The Governor is thereby an "integral part of the lawmaking power of the state." *Commonwealth ex rel. Attorney Gen. v. Barnett*, 48 A. 976 (Pa. 1901). No bill may become law without first being submitted to the Governor for approval or disapproval. *Id.* Although legislative power is vested in the General Assembly pursuant to Article II of the Constitution, we

---

[9] Article IV, Section 15 was adopted in its current form in the Constitution of 1874. With the exception of the filing and proclamation procedure, this section is substantially identical to Article I, Section 22 of the Constitution of 1790, and Article I, Section 23 of the Constitution of 1838. The two prior constitutions did not contain the filing and proclamation procedure. Instead, the final sentence of what would become Article IV, Section 15 provided as follows, with the italicized language in place of what is now the filing and proclamation procedure: "If any bill shall not be returned by the Governor within ten days after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the General Assembly, by their adjournment, prevent its return, in which case it shall be a law, *unless sent back within three days after their next meeting.*" PA. CONST. art. I, § 22 (1790); PA. CONST. art. I, § 23 (1838) (emphasis added).

have described the Governor's authority to veto a bill as a form of "limited legislative power." *Jubelirer*, 953 A.2d at 529.

The Pennsylvania colony inherited the Governor's veto power from the King of England. Notably, the monarch's frequent use of this lawmaking authority, which was vested in him as a "constituent if not a controlling third body of the parliament, in which he might and not infrequently did sit in person," was set forth as first among the grievances of the colonies in the Declaration of Independence. *Barnett*, 48 A. at 976-77; THE DECLARATION OF INDEPENDENCE para. 1 (U.S. 1776) ("He has refused his Assent to Laws, the most wholesome and necessary for the public good."). From the colonies, the veto power passed into nearly all of the American constitutions, state and federal. *Barnett*, 48 A. at 977.[10] However, "[u]nlike the royal prerogative," the executive veto is "exercised by a democratically elected leader pursuant to a clearly defined constitutional procedure." John Houston Pope, *The Pocket Veto Reconsidered*, 72 IOWA L. REV. 163, 202 (1986). Moreover, in Pennsylvania, the Governor's veto power is more constrained than that enjoyed by a number of his peers or by the President of the United States, in that the Governor does not have the luxury of inaction. That is, if Pennsylvania's Governor fails to act upon a bill that has been passed in both houses, the bill becomes law without his signature. The "pocket veto" enshrined in some state constitutions and in the United States Constitution prevents a bill from becoming law if the legislature "stands adjourned when the President's consideration period comes to a close." *The*

---

[10] Although the Pennsylvania Constitution of 1776 omitted the executive's veto power, this omission was reversed in the Pennsylvania Constitution of 1790. *See* John L. Gedid, "*History of the Pennsylvania Constitution*," in Ken Gormley, *ed.,* THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, § 3.3[d][4]-3.4[a],45-55 (2004 & Cum. Supp. 2016).

*Pocket Veto Reconsidered*, 72 IOWA L. REV. at 163;[11] *see also* U.S. CONST. art. I, § 7; *The Pocket Veto Case*, 279 U.S. 655 (1929).

The first issue before us requires us to resolve what is meant by the phrase "unless the General Assembly, by their adjournment, prevent [the bill's] return." PA. CONST. art. IV, § 15. The General Assembly is our bicameral legislature, and is comprised of the Senate and the House of Representatives. PA. CONST. art II, § 1 ("The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."). By its plain terms, the provision at issue necessitates an inquiry into whether the General Assembly has adjourned, and whether that adjournment prevented the bill's return. The resolution of these questions determines the Governor's obligation to effectuate a veto through the filing and proclamation procedure.

Our Constitution does not define "adjournment." However, we have little difficulty agreeing with the Commonwealth Court that the adjournment with which Article IV, Section 15 is concerned is that of the General Assembly, not merely the chamber in which the bill originated and to which the Governor returns the bill. This distinction is demonstrated by the language of Section 15 itself, which speaks of "both Houses," of

---

[11] The United States Supreme Court has characterized the phrase "pocket veto" as a misnomer, as it "is misleading in its implications in that it suggests that the failure of the bill in such case is necessarily due to the disapproval of the president and the intentional withholding of the bill from reconsideration." *The Pocket Veto Case*, 279 U.S. 655 (1929). Rather, as the United States Supreme Court has explained, the "pocket veto" results from a congressional adjournment before the President has had the time provided by the Constitution to consider the bill. "[W]hen the adjournment of Congress prevents the return of a bill within the allotted time, the failure of the bill to become a law cannot properly be ascribed to the disapproval of the President . . . but is attributable solely to the action of Congress in adjourning before the time allowed the President for returning the bill had expired." *Id.*

"the House in which [the bill] shall have originated," of recordation in the journal and reconsideration by that "House," of reconsideration and approval by "the other House," of recordation of the votes of "both Houses," and of the journals of "each House." PA. CONST. art. IV, § 15. After employing these terms to distinguish between the roles of the respective chambers ("Houses" in the Constitution's parlance), the concluding clause refers not to an adjournment by either chamber separately, or of the originating chamber alone, but to an adjournment by "the General Assembly." *Id.* Had the framers sought to make the adjournment of "the House in which [the bill] originated" the measure of whether the bill's return could be prevented, they would have said so. *See Wright v. United States*, 302 U.S. 583, 587 (1938) (construing "the Congress by their adjournment" in the federal veto return provision to mean both legislative chambers rather than solely the chamber in which the bill originated). Because this phrase is free from ambiguity, we will not ignore its plain language.

Although our conclusion in this regard is consistent with the manner in which the Supreme Court of the United States has construed the federal veto return provision, *see Wright*, 302 U.S. at 587, it is not universal among our sister states. *See, e.g., Opinion of the Justices*, 175 A.2d 405, 406 (Del. 1961) (construing Delaware's veto return and adjournment provision, and opining: "Of course, when the Constitution speaks of an adjournment by 'the General Assembly,' it necessarily means an adjournment of the originating house"); *In re An Act to Amend an Act Entitled 'An Act Concerning Public Utilities*,' 84 A. 706, 710 (N.J. 1912) (holding that "unless the legislature by their adjournment" as used in the New Jersey Constitution's veto return provision is

"synonymous" with "unless the house of origin by their adjournment"). It is, however, faithful to the language chosen by the framers of our Constitution.

Turning to what type of adjournment by the General Assembly is implicated by Article IV, Section 15, the Commonwealth Court held in 2004 that it encompasses any type of adjournment by both chambers of the legislature. *Jubelirer v. Pa. Dep't of State*, 859 A.2d 874 (Pa. Cmwlth. 2004). In *Jubelirer*, the legislature presented a bill to the Governor for his approval and, the next day, the House and Senate adjourned in the middle of the legislative session. *Id.* at 875. During the adjournment, the Governor disapproved the legislation. *Id.* The Governor's representative attempted to return the vetoed bill to the House, but found the House offices closed. *Id.* Accordingly, the Governor attempted to follow the filing and proclamation procedure established in Article IV, Section 15. *Id.* Nevertheless, members of the legislature challenged the validity of the Governor's veto under that section. *Id.* On the facts before it, the Commonwealth Court held that there was an adjournment by the General Assembly. In reaching this conclusion, the Commonwealth Court rejected the argument that the adjournment referred to in Section 15 means only an adjournment *sine die*, or a final adjournment by both chambers without setting a date of return. *Id.* at 877 n.2.[12]

The reasoning of *Jubelirer* is sound, and we will not disturb it. Construing the language of Section 15 in its "popular sense," *Ieropoli*, 842 A.2d at 925, that section

---

[12]   The Commonwealth Court also concluded that, because the House offices were closed when the Governor attempted to return the vetoed bills, this adjournment prevented the Governor's return. *Jubelirer*, 859 A.2d at 876. This circumstance required the Governor to follow the filing and proclamation procedure. The Commonwealth Court held that the Governor complied, thereby successfully vetoing the bill. *Id.* at 877.

clearly and unambiguously is premised upon an adjournment by the General Assembly. Accordingly, any adjournment by the General Assembly is a constitutionally significant adjournment for the purpose of Article IV, Section 15. However, anything less than an adjournment by the General Assembly is not an adjournment for purposes of Section 15. In this respect, an adjournment by the General Assembly is distinct from a temporary adjournment by one chamber without the other. *See, e.g.,* PA. CONST. art. II, § 14 (providing that neither "House" shall adjourn for more than three days without the consent of the other). For purposes of this opinion, in order to confine our analysis to an adjournment by the General Assembly as Section 15 requires, we will refer to the adjournment of only one chamber, either overnight or for a period of three days or fewer, as a temporary recess of one chamber without the other. *See generally* Pope, *The Pocket Veto Reconsidered*, 72 IOWA L. REV. at 164 n.9 (defining various types of legislative adjournments as distinct from temporary recesses of one chamber without the other for three days or fewer). Therefore, an adjournment for purposes of Section 15 is any adjournment by the General Assembly, but does not include a temporary recess of one chamber without the other.

We recognize that, although Section 15 speaks of an adjournment by the General Assembly, it also mandates that the chamber to which the bill is returned is the chamber in which the legislation originated, which is then under the obligation to enter the Governor's objections onto the journal and proceed to reconsider the bill. If the General Assembly has not adjourned, but the chamber in which the bill originated has done so, there is a temporary recess by one chamber without the other, not an adjournment as required by Section 15 as a prerequisite to the prevention of the return.

The phrase in Section 15 beginning with "unless the General Assembly, by their adjournment" would be inapplicable. The practical means of return to the originating chamber during a temporary recess by one chamber without the other is not before us. *See, e.g., Wright*, 302 U.S. at 598 (holding that an adjournment by Congress was a prerequisite to prevention in the federal veto return provision; and sanctioning return via a proper agent during a temporary recess of one chamber without the other). This point bears emphasis: it is the bicameral action of both chambers that distinguishes unicameral action by one chamber from actions by the General Assembly as such. Only an adjournment by the General Assembly constitutes an adjournment for purposes of Section 15.

Having established that it is an adjournment by the General Assembly with which Section 15 is concerned, rather than solely the originating chamber, we also conclude that the General Assembly had, in fact, adjourned when the Governor sought to return the bills and his objections on July 10, 2014. As reflected in the legislative journals, both chambers of the General Assembly were adjourned on that date. *See supra* n.3.

The Commonwealth Court held that whether the General Assembly had adjourned depended not upon whether both chambers were adjourned, but upon whether their respective adjournments were accomplished by a concurrent resolution. To reach this conclusion, the Commonwealth Court relied upon Article II, Section 14 of the Constitution, which provides that "[n]either House shall, without the consent of the other, adjourn for more than three days, nor to any other place than that in which the two Houses shall be sitting." PA. CONST. art. II, § 14. Additionally, the Commonwealth Court felt itself bound by 101 Pa. Code § 7.24(a), which provides that "[n]either house

may, without the consent of the other house, adjourn for more than [three] days. Such an adjournment is accomplished by the adoption of a concurrent resolution." Accordingly, the Commonwealth Court concluded that an adjournment by the General Assembly requires the consent of each chamber to the adjournment of the other, and that consent can be demonstrated only by a concurrent resolution. This is incorrect, for several reasons.

First, Article IV, Section 15 requires consideration of whether the General Assembly was, in fact, adjourned. There is no factual dispute that the General Assembly was adjourned on July 10, 2014, when the Governor attempted to return the vetoed bills. *See supra* n.3. To answer the factual question before us, we need not resolve whether one chamber adjourned with the consent of the other. Second, to the extent consent is a factual predicate to adjournment, it is a reasonable presumption that, when the legislative journals reflect that both chambers were adjourned in excess of three days, it was by consent rather than in violation of Article II, Section 14 of the Constitution.

Third, although Article IV, Section 15 requires an examination of whether the General Assembly had adjourned, Article II, Section 14 is concerned with ensuring that each chamber obtains the consent of the other chamber before adjourning unilaterally in excess of three days. *See Frame v. Sutherland*, 327 A.2d 623, 626 (Pa. 1974) ("The entire constitution[al] scheme is clearly predicated on the assumption that adjournment

[of more than three days] may not be a unilateral act on the part of one of the houses of the General Assembly.").[13] We are not here faced with a unilateral adjournment.[14]

Our analysis now turns to the prevention aspect of Section 15: whether the General Assembly's adjournment prevented the Governor's return. The wording of Section 15 leaves unanswered the question of whether all adjournments by definition prevent the return of a bill, or whether only certain adjournments may prevent the return.

During a legislative session, Section 15 requires the Governor physically to return the bill with his objections to the legislature. PA. CONST. art. IV, § 15. The originating chamber, in turn, accepts the returned bill and objections, enters the

---

[13]    In his concurring and dissenting opinion, Justice Baer highlights the factual ambiguity regarding the General Assembly's adjournment that may arise in other scenarios. *See* Concurring and Dissenting Opinion at 3 (questioning whether a short break is an adjournment for purposes of Section 15, or whether a simultaneous adjournment by both chambers without mutual consent is an adjournment for purposes of Section 15). The broad construction endorsed by Justice Baer would encompass any adjournment, of any duration, by both chambers. *Id.* at 5.

While we may agree with Justice Baer that the simultaneous overnight adjournment by both houses may constitute a Section 15 adjournment in a case presenting such a scenario, we need not resolve that factual scenario in this case. Rather, the facts before us include an adjournment by the General Assembly in excess of three days, as demonstrated by the respective journals. Although Justice Baer opines that the adjournment of each chamber must have been accomplished with the consent of the other in accord with Article II, Section 14, *id.* at 6, as explained above, this provision is concerned solely with the unilateral adjournment of one chamber. *Frame*, 327 at 626.

[14]    It bears noting that the Commonwealth Court's reliance upon the Pennsylvania Code's requirement of a concurrent resolution to demonstrate consent was misplaced in any event. Although a concurrent resolution would certainly be probative of a bicameral adjournment, it is not dispositive. We are tasked solely with interpreting the language of the Constitution. The Pennsylvania Code is not constitutional or statutory law, nor even a regulation as such. It is rather a compilation of procedures published by the Legislative Reference Bureau, a supporting agency of the General Assembly, "for informational purposes only." *See* Preface to Pa. Code tit. 101. As such, the Code itself lacks binding effect. It does not control our interpretation of the Constitution.

objections upon its journal, and proceeds to reconsider it. *Id.* The Governor may return the bill at any time within the ten days provided for his consideration, unless by reason of adjournment of the General Assembly he is prevented from doing so. *Id.* Section 15 contemplates a collaborative process between the legislature and the executive, and directs that, in the case of a veto, the product of the Governor's deliberation, *i.e.,* his objections, must be shared with the legislature for recordation upon its journal and for the legislature's own deliberation and reconsideration.

Our construction of the phrase "unless the General Assembly, by their adjournment, prevent its return" in Section 15 is informed by the specific purposes that the veto return procedure is intended to serve. These purposes are manifest in the language of Section 15: to provide the Governor with suitable time to consider the legislation, to provide the public with notice of the status of legislation via the legislative journal, and to provide the legislature with the opportunity to reconsider the legislation in light of the executive's objections.

Public notice of the status of legislation is achieved by the constitutional command that, upon the Governor's return, the chamber in which the bill originated shall enter the Governor's objections at large upon its journal, before it proceeds to reconsider the legislation. The legislative journal is a record of the basic steps in the legislative process, and the Pennsylvania Constitution requires that the legislature record its official actions in the journal. *See* PA. CONST. art II, § 12 (requiring each legislative chamber to "keep a journal of its proceedings"); PA. CONST. art III, § 8 (requiring the signing of bills to be entered on the journal); PA. CONST. art. III, § 5 (requiring votes on amendments to bills to be recorded in the journal); PA. CONST. art.

XI, § 1 (requiring proposed constitutional amendments to be entered in the journal). The legislature constitutionally is required to make and preserve an accurate record of its actions, a requirement that was codified with the creation of the Legislative Journal. *See* 46 P.S. § 81.

Legislative journals provide a clear, accurate, verifiable, public record of the legislative process by which a bill becomes law, and they demonstrate whether a bill has been enacted by the legislature, has been vetoed by the Governor, and, if so, whether the legislature has overridden the veto. The journal not only provides public notice as to the status of legislation, it also puts the members of the chamber in which the bill originated on notice that the Governor has vetoed the bill so that they can determine whether to reconsider the bill. As the Supreme Court of the United States has remarked, legislative journals create an official record, "giving public, certain and prompt knowledge as to the status of the bill." *The Pocket Veto Case*, 279 U.S. at 685. By the design of Section 15, when the General Assembly is in session, the chamber in which the bill originated receives a returned bill from the Governor, provides a record of the return and notice to the public about the state of the legislation by entering the objections upon the journal, and proceeds to reconsider the bill.

In contrast, during an adjournment by the General Assembly, the chamber in which the bill originated cannot exercise any of its constitutional functions. It can neither enter the Governor's objections upon its journal nor proceed to reconsider the legislation. *See Frame*, 327 A.2d at 627 (by adjourning, a legislative chamber "disabl[es] itself from the consideration of bills"). Because the originating chamber cannot enter the return into its journal while the General Assembly is adjourned, public

notice of the veto is compromised until the General Assembly reconvenes.  Until then, nothing will alert the public about the bill's status.  Allowing the Governor to return a bill to the originating chamber during an adjournment of the General Assembly would deprive the public of prompt notice of the legislation's status.

Under Section 15, the originating chamber can receive the bill only when the General Assembly sits in an organized capacity for the transaction of business, the originating chamber is able to enter the Governor's objections upon its journal, and that chamber is in a position to reconsider the bill.  Only actual and public return to the originating chamber while the General Assembly is in session can fulfill the Governor's return obligation and provide prompt public notice about the status of the bill.  Accordingly, we hold that, pursuant to Section 15, the Governor cannot return a bill to the originating chamber when the General Assembly has adjourned.

It is the prospect that the public will not be informed promptly and properly about the return of a vetoed bill by recordation of the Governor's objections upon the legislative journal that also drives our conclusion that return to an agent will not satisfy the constitutional obligation of a return to the chamber in which the bill originated.  Without authority to accept the return, notify the legislature, and record the Governor's objections upon the legislative journal as required by Section 15, this agent would be obliged to hold the Governor's return in "a state of suspended animation," *The Pocket Veto Case*, 279 U.S. at 684, providing no record or notice of the receipt that Section 15 requires.

The Governor appears to argue that returning a bill during an adjournment to an agent or representative of the originating chamber who has the authority to enter the

Governor's objections upon the legislative journal would provide the constitutionally required record of return, notice to the public about the status of the legislation, and notice to the members of the originating chamber that the bill had been returned. We reject this argument as too speculative. Were we to contemplate return to an agent during a bicameral adjournment, a question would arise regarding who may accept the Governor's veto and record the Governor's objections upon the journal. The vagueness of authorizing delivery to an agent of the chamber suggests the constitutional infirmities of this approach. How can we assess who may perform these functions on behalf of the adjourned legislative chamber, and how is the Governor to know that his veto is effectuated by return to this individual? Such vagaries suggest the weakness of this argument.

The Governor offers the House Parliamentarian as the individual who may accept the Governor's veto. According to the Governor, it is consistent with long-standing practice to make a veto return to the House Parliamentarian, whether or not the House of Representatives is in session. We reject the Governor's argument that the procedure utilized for the return of a bill during a legislative session somehow dictates the procedure to be used during an adjournment of the General Assembly. When the General Assembly is in session, the originating chamber may accept the return via an agent or representative, record the Governor's objections in the legislative journal, and proceed to reconsider the bill. Whatever practices the executive and legislative branches utilize to facilitate a return during a legislative session, when the originating chamber is capable of undertaking the obligations imposed by Section 15, are of little

guidance in discerning when an adjournment of the General Assembly may prevent the Governor's return.

Were we to presume that each chamber (or "House") of the legislature may by appropriate action confer upon certain agents the authority to receive a bill returned by the Governor, we would have no basis upon which to presume that the House has conferred such authority upon the House Parliamentarian. The House Parliamentarian is a creature of statute, appointed by the Speaker of the House of Representatives at the commencement of each session of the General Assembly. *See* 46 P.S. § 36.[15] This statute does not confer upon the House Parliamentarian the important constitutional function of receiving veto returns from the Governor, entering the Governor's objections upon the journal, and retaining custody of them until the House reconvenes.

Nevertheless, the Governor asserts that the record before us establishes that the House Parliamentarian accepted the return in accord with the long-standing practice of the Governor and the General Assembly. Governor's Brief at 15. The sole basis for the Governor's argument is the affidavit of Nicole Bordonaro, Executive Deputy General Counsel for Legislation in the Office of General Counsel. R.R. 657a-59a. Ms. Bordonaro stated that, after the Governor signed and partially vetoed the GAA and the FCA, an employee of the Office of General Counsel, acting as a representative of the

---

[15] The House Parliamentarian "advise[s] the Speaker on parliamentary questions and legislative procedure, and . . . perform[s] such other duties in connection with the house desk and house transcribing room as the Speaker and Chief Clerk of the house shall direct." 46 P.S. § 36. Additionally, "[b]etween legislative sessions, the parliamentarian shall perform such duties for the Speaker, any committee of the house, or any legislative commission, as the Speaker of the house shall prescribe." *Id.*

Governor, delivered the partially vetoed bills to the office of the House Parliamentarian "consistent with the established procedure for the return to the House by the Governor of bills that he has vetoed pursuant to Article IV, Section 15, of the Pennsylvania Constitution, or that contain items that he has vetoed under Article IV, Section 16 of the Constitution." *Id.* at 658a-59a.

This affidavit does not address the House Parliamentarian's authority to record the Governor's objections upon the legislative journal. Indeed, the Governor appears to agree with the Senators that the House Parliamentarian can do none of the acts required of the originating chamber upon the Governor's return. *See* Governor's Brief at 27 ("[T]he Parliamentarian can ensure that, when the House is next in session, its members will learn of the veto and may, if they choose, seek to override that veto."). Indeed, when the Governor returned the bills and objections to the House Parliamentarian, the House Parliamentarian did not enter these objections upon the legislative journal. There are no entries upon the legislature journal during the time the House and Senate were adjourned, and no entries thereafter reflecting the Governor's return of the legislation with objections. Without entry onto the journal, there was no public notice concerning the status of the legislation as required by Section 15. Accordingly, we reject the Governor's argument that the House Parliamentarian was capable of accepting the return on behalf of the House during an adjournment of the General Assembly.

Attentive regard for the reasoning and experiences of our sister states and the national government on both sides of this issue informs our conclusion that return must be made while the General Assembly is in session, and cannot be made to an agent

during an adjournment of the General Assembly. These decisions are, on balance, conflicting, due in no small part to different definitions of the constitutional requirement of an adjournment, as well as variations in long-standing practices.

Perhaps the most well-known of the precedents is *The Pocket Veto Case*, interpreting the veto return provision of the Presentment Clause of the United States Constitution, U.S. CONST. art. I, § 7, Cl. 2, which parallels our own Article IV, Section 15 in some respects. The clause provides that if the President, following the presentment of a bill by the legislature, does not sign and approve the bill, "he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal and proceed to reconsider it." U.S. CONST. art. I, § 7, Cl. 2. Further, "[i]f any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in the like manner as if he had signed it, unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law." *Id.* Faced with the question of whether a congressional adjournment that began on the seventh day of the President's consideration of proposed legislation and continued through the tenth day prevented the President's return of the bill, the Supreme Court of the United States addressed the precise issue we now consider, *i.e.*, whether Congress, by its adjournment, prevented the President from returning the bill within ten days. 279 U.S. at 674. In no uncertain terms, the United States Supreme Court rejected the argument that the President could, during a mid-session adjournment of Congress, return the bill to the originating chamber via an appropriate agent, to be held by such agent and presented to the originating chamber when that house reconvened. *Id.* at 674-75. Using broad language, the Court

explained that, during a congressional adjournment, the originating chamber would be unable "to receive the return, enter the President's objections on its journal, and proceed to reconsider the bill." *Id.* at 682. Therefore, the High Court concluded that no return can be made during an adjournment of Congress. *Id.* at 683.

Rejecting the argument that return could be made during the adjournment via an officer or an agent of the originating "House," the Court held that delivery of the bill to such an officer or agent, who could "hold it in his own hands for days, weeks or perhaps months, . . . keeping the bill . . . in a state of suspended animation until the House resumes its sittings, with no certain knowledge on the part of the public as to whether it had or had not been seasonably delivered, and necessarily causing delay in its reconsideration which the Constitution evidently intended to avoid," would not suffice. *Id.* at 684. Return to an agent was, the Court held, a "fictitious return," unable to provide the public with certain and prompt knowledge as to the status of the bill. *Id.* at 685.

Likewise, in Alabama, "[n]o congregation of the members of the house can, in a constitutional sense, constitute the House . . . or exercise any of its constitutional functions" during a legislative adjournment, nor can the return be made to any officer of the originating house when the legislature is not in session. *State v. Joseph*, 57 So. 942, 944 (Ala. 1911). Similarly, in Connecticut, by custom and practice, the Governor may only effectuate a veto return "by his hand for delivery in open house." *State v. Town of S. Norwalk*, 58 A. 759, 760 (Conn. 1904). In Connecticut, like Pennsylvania and its federal counterpart, "[i]t is of the first importance that the people should know to what law they are subject." *Id.* Considering the importance of public notice, the Connecticut court reasoned that the means of knowledge may only be had if the fact of

the return and the date of the return are readily ascertainable, which cannot occur during a legislative adjournment. *Id.*; *see also An Act Concerning Public Utilities*, 84 A. at 710 (rejecting the argument that return may be made during a legislative adjournment by delivering the bill to an officer of the originating chamber); *Opinion of the Justices*, 175 A.2d at 409 (holding that an adjournment prevents the return of a bill, and observing that "[d]elivery to an officer of the house involves not only a serious constitutional question, but, as a practical matter, presents serious difficulties" such as the lack of public notice); *Illinois ex rel. Harless v. Hatch*, 33 Ill. 9 (1863) (rejecting the argument that the Governor could make a return during an adjournment via an agent of the originating chamber, and holding that unless the legislature is in session, the Governor cannot return a vetoed bill).

All of these decisions are driven by the recognition that an executive return during a legislative adjournment (however that jurisdiction defines a constitutionally significant adjournment) will, *ipso facto*, preclude public notice of the return, thereby depriving the public of the ability to know by which laws the people are bound, a constitutional infirmity that delivery to an agent cannot overcome.

In contrast, several other states have disregarded the public notice component of the veto return process. Courts from these states have held that a mid-session adjournment does not necessarily prevent a return because the Governor's objections may be delivered to officers, agents, or representatives of the chamber in which the bill originated, to be held until that chamber reconvenes. Significantly, most of these jurisdictions define "adjournment" for purposes of their veto return provision as a final

adjournment. In these jurisdictions, without a final adjournment, there could be no question as to whether the adjournment could have prevented the Governor's return.

For example, the Wisconsin, Louisiana, New Hampshire, Michigan, Minnesota, and Tennessee courts have defined adjournment for purposes of their respective constitutional veto return provisions to mean only an adjournment *sine die*. Anything less is not an adjournment that prevents the Governor's return. This stands in sharp contrast to the law of Pennsylvania, which provides that any type of adjournment by the General Assembly may prevent the Governor's return. *See Jubelirer*, 859 A.2d at 876-77. Based upon this interpretation, these state courts have held that a mid-session adjournment does not prevent the Governor's return, the constitutional provision pertaining to an adjournment that may prevent the Governor's return is not implicated, and return to an agent or officer of the legislative body during a mid-session adjournment does not, therefore, raise any constitutional implications. *See State ex rel. Sullivan v. Dammann*, 267 N.W. 433, 436-37 (Wis. 1936) (unless the adjournment is *sine die*, the Governor could effectuate the return of vetoed legislation by delivering it to an officer or clerk to be held until the originating chamber reconvened); *Opinion of Justices*, 45 N.H. 607, 610 (1864) (providing that return during a mid-session adjournment may be made "to the speaker, or to the clerk, or some other proper officer"); *Johnson City v. Tenn. Eastern Elec. Co.,* 182 S.W. 587 (Tenn. 1916) (holding that return may be made during a mid-session adjournment to the clerk of the originating chamber); *State ex rel. State Pharmaceutical Ass'n v. Sec. of State*, 27 So. 565 (La. 1900) (holding that only a final adjournment by the legislature may prevent the Governor's return); *Wood v. State Admin. Bd.*, 238 N.W. 16, 19-20 (Mich. 1931)

(holding that only a final adjournment may prevent the Governor's return of a vetoed bill; otherwise, "return may be made to the proper officer"); *State v. Hoppe,* 215 N.W.2d 797, 804 (Minn. 1974) (holding that because a temporary adjournment of the legislature does not prevent the return of the bill, the Governor was free to return the bill, with objections "to any member or officer of the proper house of the legislature").

Similarly, in *Wright*, the United States Supreme Court established that only the Senate (the chamber in which the legislation had originated) had adjourned. Congress, as such, had not adjourned. Thus, there was no constitutionally significant adjournment, and it could not be that "Congress by their Adjournment prevent[ed]" the bill's return. Rather, the Court instead confronted a temporary recess of one chamber without the other, and the prevention aspect of the veto return provision of the United States Constitution was not implicated. 302 U.S. at 587 (citing U.S. CONST. art. 1, § 7, Cl. 2); *id.* at 597 ("[T]he words of paragraph 2 of section 7 [of Article I] are inapplicable."). From this premise flowed the Court's conclusion that the President's return to the Senate during a temporary recess of the Senate could be made to the Secretary of the Senate. The Court identified the concerns that drove the decision in *The Pocket Veto Case*: uncertainty about the fact of delivery and prolonged uncertainty about the status of the legislation. According to the High Court, these concerns were absent in *Wright* and served to distinguish *The Pocket Veto Case*.

To the extent any consistency can be ascertained from these cases, they support the Senators' position. In jurisdictions where only a final, *sine die* adjournment of both legislative houses will prevent the executive's return, during a mid-session adjournment or a temporary recess of one chamber without the other, return to an authorized agent

or representative will suffice.[16]  In these jurisdictions, without the factual predicate of a constitutionally significant adjournment, a mid-session adjournment could not, by definition, prevent the executive's return.  However, in states that have construed the adjournment requirement of their respective veto provisions to include all bicameral adjournments as this Court has now concluded, return during an adjournment to an officer or agent will not suffice.

As in the federal constitutional context, the adjournment of which our own Section 15 speaks is any simultaneous adjournment by both chambers of the legislature.  It is the bicameral action by both chambers that distinguishes action by one chamber.  When the Governor seeks to return a bill and both chambers of the General Assembly are in session, the Governor returns the vetoed bill to the originating

---

[16]  Chief Justice Saylor believes that our interpretation of "General Assembly" in Article IV, Section 15 is problematic because, if the originating chamber has adjourned, but the other chamber has not, the Governor can neither effectuate a return to the originating house nor utilize the filing and proclamation procedure.  While we agree with the Chief Justice that we do not currently confront the scenario he imagines, it is worth noting that other jurisdictions have dealt effectively with this dilemma.  For instance, pursuant to *Wright*, when the originating chamber has adjourned but Congress has not, then return by the President to an appropriate agent of the adjourned chamber will suffice.  *Wright*, 302 U.S. at 592.  Moreover, to the extent Chief Justice Saylor's dilemma imagines that the adjourned chamber has failed to appoint an appropriate agent, at least one commentator has suggested that, in the absence of a legislative adjournment, "evasion by the originating [chamber] of presidential return of a bill has a counterpart in presidential evasion of congressional presentation of a bill.  The factors that inhibit the latter event may be applied to control the former."  Pope, *The Pocket Veto Reconsidered*, 72 IOWA L. REV. at 199 n.336.  Pope observed that there is an implied constitutional duty on the part of the President to be reasonably available to receive a bill from Congress.  *See Eber Bros. Wine & Liquor Corp. v. United States*, 337 F.2d 624, 630 (Ct. Cl. 1964).  If the executive is constitutionally obligated to be available for presentation from the legislature, then perhaps a reciprocal obligation would require the originating chamber, in the absence of a legislative adjournment, to be reasonably available to receive the return of disapproved bills.  Pope, *The Pocket Veto Reconsidered*, 72 IOWA L. REV. at 199 n.336.  As the issue is not before us, we will refrain from engaging further in hypothetical dilemmas.

chamber. When both chambers of the General Assembly have adjourned, the Governor cannot constitutionally return a bill, and the Governor must turn to the filing and proclamation procedure.

Resolving the constitutional limitations of the veto return process during an adjournment by the General Assembly does not resolve whether the Governor effectively vetoed the GAA and FCA. Because the General Assembly, by its adjournment, prevented the Governor's return, the Governor was obligated to comply with the filing and proclamation procedure of Section 15 to effectuate his partial veto of the FCA and GAA. Indeed, any factual ambiguity that may arise during the veto return process can always be cured by the Governor's compliance with the filing and proclamation procedure to effectuate his veto. It is to this second issue that we now turn.[17]

### III. The filing and proclamation procedure

Our Constitution provides two alternative methods by which the Governor may veto legislation. If the General Assembly is not adjourned, then, upon return, the veto is

---

[17]   Chief Justice Saylor suggests that, given the factual predicate of this case, we need not resolve whether the General Assembly, as opposed solely to the originating chamber, must be adjourned to prevent a gubernatorial return. While jurisprudentially sound as a general principle, Chief Justice Saylor's suggestion is inapt under the particular circumstances of this case. The filing and proclamation procedure is implicated only where there has been an adjournment by the General Assembly. It is therefore necessary to answer the question of whether there has been such an adjournment prior to considering whether the Governor complied with the filing and proclamation procedure.

effective. If the General Assembly is adjourned, then the Governor must follow the filing and proclamation procedure in order to effectuate his veto.[18]

According to the Commonwealth Court, the Governor complied with the public proclamation requirement of Article IV, Section 15 by having the Office of the Budget issue a press release regarding the Governor's vetoes. The July 10, 2014 press release was entitled "Governor Corbett Signs 2014-15 Budget and Fiscal Code, Vetoes Specific Legislative Appropriations and Places Legislative Spending Initiatives into Budgetary Reserves." R.R. 661a-64a. Included in the press release were quotations from the Governor purporting to have partially vetoed the legislation in order to balance the budget for the benefit of the people of Pennsylvania in the face of the General Assembly's refusal to do so. *Id.* Although the Governor highlighted those aspects of the legislation that advanced key administration priorities, he also was critical of the General Assembly for its "failure to address critical challenges facing our state." *Id.* at 661a. The press release took particular aim at the General Assembly's allocation of funds with which the Governor disagreed, targeting the General Assembly's increase of its own budget, and praising the use of the Governor's line-item veto to eliminate these spending provisions. After listing the vetoed provisions, the press release criticized the General Assembly for failing to engage in pension reform and for forcing local school districts to raise property taxes. The press release quoted the Governor's call to the citizens of Pennsylvania to join him in demanding action from the General Assembly on pension reform. *Id.* at 662a.

---

[18] There is no dispute herein that the Governor filed the bills and his objections with the Secretary.

The Senators dispute the Commonwealth Court's conclusion that the press release was a public proclamation as intended by the Constitution. They assert that the notice that is to be provided by the public proclamation is the fact that the Governor has filed the bill and his objections with the Secretary of the Commonwealth, rather than a generalized description of the vetoed provisions. The Senators observe that the press release failed to include this critical information. The Senators further argue that the informality of this press release undermines the conclusion that it could serve as a public proclamation; indeed, formality is its defining feature.

The Governor argues that, because the press release provided notice to the public about the Governor's vetoes, it sufficed as a public proclamation. Addressing the degree of formality required of a public proclamation, the Governor argues that the Senators seek to enshrine formality for its own sake, without addressing the purpose of the public proclamation. The Governor characterizes this purpose as an official announcement to the public of matters of governmental importance. Noting that formality is not constitutionally required, the Governor claims the discretion to decide upon the form a public proclamation should take.[19]

Section 15 contains mandatory provisions to effectuate a veto when the General Assembly's adjournment prevents the Governor's return directly to the chamber in which the legislation originated. Although the filing and proclamation procedure has

---

[19] The Senators also argue that, if the press release was a proclamation, then the Governor did not issue the press release as Section 15 requires. Rather, the Office of the Budget issued the press release. The Governor responds that the Office of the Budget simply acted as the Governor's representative in this regard by issuing the public proclamation on the Governor's behalf. Because we find the other arguments dispositive, we need not and do not resolve this dispute.

been part of our Constitution since 1874, there is little evidence of the history regarding its addition. Nor does the Constitution contain a definition of public proclamation. We presume that the framers of the filing and proclamation provision carefully considered the Governor's veto power, an executive prerogative which must be exercised within the time and manner provided in the instrument granting that prerogative. When the Governor chooses to utilize his veto authority, no question should exist as to the necessary factual predicates.

We have not had prior occasion to define a public proclamation.[20] *See In re City of Pittsburg*, 66 A. 348, 349 (Pa. 1907) (observing that, although the Constitution requires the Governor to issue a proclamation to call the General Assembly together in an extraordinary session, "no form of proclamation is to be followed"). In its "popular, natural and ordinary meaning," as commonly understood when adopted, *Harmon*, 366 A.2d at 897 (directing our interpretation of the words of the Constitution), a public proclamation is a formal public announcement. *See, e.g.,* 7 THE OXFORD ENGLISH DICTIONARY 1412 (1st ed. 1909) (defining proclamation as "a formal order or intimation issued by the sovereign or other legal authority, and made public either by being announced by a herald or by being posted up in public places"); 12 THE OXFORD ENGLISH DICTIONARY 552 (2d ed. 1989) (same); BLACK'S LAW DICTIONARY (10th ed. 2014) (defining proclamation as "[a] formal public announcement made by the government").

---

[20] Section 15 is not the only provision of our Constitution to require proclamations. The Governor must issue a proclamation to call a special session of the General Assembly, PA. CONST. art. III, § 12, and to convene the Senate in an extraordinary session, PA. CONST. art. IV, § 12.

These definitions encompass two aspects of what is commonly understood as a public proclamation: public notice and formality. As understood in its ordinary meaning, a public proclamation is intended to provide formal notice to the public of an official governmental matter of importance.

With regard to public notice, Section 15 provides that, when the General Assembly's adjournment prevents the Governor's return of a veto, the veto will nevertheless be effective if the Governor "shall file the same [*i.e.*, the bill], with his objections, in the office of the Secretary of the Commonwealth, and give notice thereof by public proclamation." PA. CONST. art. IV, § 15. The content of the public proclamation is therefore dictated by the plain language of Section 15. The "notice thereof" that is to be provided by public proclamation is notice that the Governor has filed the bill and his objections with the Secretary of the Commonwealth. Substantively, this is the only requirement for the content of a veto proclamation provided by Section 15. We agree with the Senators that the press release issued by the Office of the Budget failed to include the requisite notice that the Governor had filed the bill and his objections with the Secretary.

Attempting to establish the July 10, 2014 press release as a public proclamation, the Governor cannot overcome this substantive failing. Rather, the Governor's argument is that the public should be more concerned with the fact of a veto than with his technical compliance with the filing requirement of Section 15. However, the Governor's argument about what the public is more likely to concern itself with cannot overcome the plain language of the filing and proclamation procedure established by

Section 15. Pursuant to the substantive requirement for a public proclamation in this context, the press release did not provide the notice required by Section 15.

The intent apparent in the public proclamation provision of Section 15 is to ensure public notice about the status of legislation, just as this intent is apparent in the veto return requirement that the legislature enter the Governor's objections upon its journal. In either scenario, the public ostensibly is apprised of the status of the legislation. *See The Pocket Veto Case*, 279 U.S. at 685 (observing the importance of providing the public with "public, certain and prompt knowledge as to the status of the bill"). The proclamation notifies the citizens of Pennsylvania that an event of legal or constitutional significance has occurred, and directs that, should the public desire to view the Governor's vetoes, the bill and objections have been filed and are accessible for inspection.

In addition, formality in this context puts the public on notice that the announcement has official significance, and signifies the gravity of the information that the announcement conveys. Clarity thwarts misapprehension regarding the act's significance. This clarity is achieved through formality, a principle that prevents the attachment of constitutional significance to informal political communications conveyed in sundry formats ranging from press advisories to impromptu media opportunities to Instagram to tweets, and to many other scenarios limited only by what the human mind and technological progress can conjure. Formality is a critical tool in distinguishing political rhetoric and advocacy in its myriad forms from public notice of a constitutionally or legally significant declaration. Such formality cannot be abandoned.

Indicia of formality historically have included official designations of an announcement's constitutional significance, whether by entitling it a proclamation or, more recently, a notice of veto, or by affixing the Governor's signature under seal of the Commonwealth. Such indicia have characterized veto proclamations that the Governor has issued since the filing and proclamation procedure was added to the Constitution of 1874. They serve to put the public on notice that there are important legal implications to the official government action.

As reflected in an opinion of the Attorney General from 1915, "it has been the universal custom for the Governor to make public proclamations of all bills vetoed after the legislature has adjourned" in substantially the following form, which appears in the Pamphlet Laws:

A Proclamation by the Governor.

In the name and by the authority of the Commonwealth of Pennsylvania.

Executive Department.

A Proclamation.

"I (name of Governor), Governor of the Commonwealth of Pennsylvania, have caused this proclamation to issue, and in compliance with the provisions of Article IV, Section 15, of the Constitution, do hereby give notice that I have filed in the office of the Secretary of the Commonwealth, with my objections thereto, the following bills passed by both Houses of the General Assembly, viz., Senate Bill No. -, etc., etc."

*Recall of Bills Disapproved by the Gov.*, 24 Pa. D. 544, 547, 1915 WL 5000, at *4 (Pa. Atty. Gen. 1915).

Additionally, proclamations are routinely published in the Pennsylvania Bulletin in a similar format, with comparable indicia of formality:

PROCLAMATION

I, Dick Thornburgh, Governor of the Commonwealth of Pennsylvania, have caused this Proclamation to issue and, in compliance with the provisions of Section 15 of Article IV of the Constitution of Pennsylvania, do hereby give notice that I have filed in the Office of the Secretary of the Commonwealth, with my objections thereto, the following bills passed by both houses of the General Assembly at the Regular Session of 1984, viz:

House Bill No. 971, Printer's No. 1098, entitled "An act exempting bonds of municipalities and school districts of the Commonwealth of Pennsylvania from taxation within the Commonwealth of Pennsylvania."

House Bill No. 386, Printer's No. 605, entitled "An act amending the act of June 1, 1959 (P. L. 392), entitled 'An act relating to the retirement of State employes; amending, revising, consolidating and changing the laws relating thereto,' further defining the term 'State employe' and providing for crediting of certain service in the Philadelphia retirement system to the State system."

GIVEN under my hand and the Great Seal of the Commonwealth, at the City of Harrisburg, this thirtieth day of December, in the year of our Lord one thousand nine hundred and eighty-four, and of the Commonwealth the two hundred and ninth.

BY THE GOVERNOR:            DICK THORNBURGH
                           Governor

William R. Davis
Secretary of the Commonwealth

101 Pa. Code § 19.363.[21]

Consistent with this practice, veto proclamations since 1874 have included the express language that the Governor has filed the bill and his objections with the Secretary of the Commonwealth, expressly have been designated as proclamations (or lately, perhaps notices of veto), and have included the signature of the Governor under

---

[21] We offer the Pennsylvania Code proclamation template and the 1915 opinion of the Attorney General in order to illustrate the political branches' historical understanding of public proclamations, not to prescribe and mandate rote adherence to a specific script.

seal of the Commonwealth. Although not binding upon the judiciary in our interpretation of the Constitution, we afford "respectful consideration and persuasive force" to this historical understanding and past practices of the executive branch, whose duty it has been since 1874 to issue veto proclamations in accord with Section 15. *See Renshaw v. Mayor & Select & Common Councils of City of Phila.*, 93 A. 1080, 1082 (Pa. 1915). This experience shows the executive's traditional and historical understanding of a veto proclamation.

This is not to say that the Governor may not, in his discretion, alter the form of a veto proclamation from this traditional usage. What the Governor may not do, however, is abandon the requirement that a veto proclamation include the Governor's assertion that he has filed the vetoed bill and his objections with the Secretary of the Commonwealth. Nor may the Governor abandon the hallmarks of a public proclamation: public notice and formality.[22]

Notwithstanding the necessity of formality, the means by which a proclamation is delivered to the public may well evolve over time. Whether the Governor chooses to

---

[22] To the extent that Justice Donohue would dispense with formality as a constitutional requirement, we respectfully disagree. As explained above, a public proclamation, as commonly understood in 1874, includes public notice and formality. The requirement of formality is rooted in the Constitution's language, interpreted in its popular sense, as understood by the people when they voted for its adoption. *See Ieropoli*, 842 A.2d at 925. We are not engrafting requirements onto the Constitution, but are rather interpreting that charter, as we must.

To the extent that Justice Donohue agrees with the requirement of formality but disagrees that formality is demonstrated by the announcement's designation and the Governor's signature under seal, we emphasize that our holding today is not intended to define and codify for all time the manner in which formality is established in every instance. Instead, we intend merely to demonstrate the historical understanding of public proclamations in our Commonwealth and to compare this understanding to the lack of formality evident in the July 10, 2014 press release.

make the proclamation public by posting it online, by publishing it in a newspaper, or through other reasonable means designed to effectuate public notice, the specific mode of dissemination is not dispositive in our analysis of whether the item disseminated was indeed a proclamation.

In addition to omitting a statement that the Governor had filed the bill, with his objections, with the Secretary of the Commonwealth, the July 10, 2014 press release lacked any hallmarks of formality that would render it a constitutionally significant pronouncement. Rather, it was an informal communication to the public via mass media. Although it achieved the objectives of public dissemination, it lacked the formality required to make the public aware that the announcement had legal and constitutional significance. We agree with the Senators that the Commonwealth Court's acceptance of the press release as a veto proclamation "reduce[d] a constitutional mandate to a negligible informality." Senators' Brief at 38. The July 10 press release was, by its own designation, simply a press release. It was not a proclamation. Accordingly, the Governor failed to comply with the filing and proclamation procedure of Article IV, Section 15 to effectuate his vetoes of the FCA and the GAA. Those bills became law in their entirety.

Having determined that the Governor's purported partial vetoes of the FCA and the GAA failed, we have no occasion to resolve whether the Governor's line-item veto authority of Article IV, Section 16 extends to the FCA. The veto was ineffective in its entirety in any event. Accordingly, resolution of the last issue before us must await another day.

We reverse the Commonwealth Court's December 30, 2015 Opinion and Order denying summary relief to the Senators. We hold that the Governor's purported vetoes of the FCA and the GAA were constitutionally deficient, and that the Senators were entitled to summary relief on their petition for review.

Justices Todd and Mundy join the opinion.

Chief Justice Saylor joins Parts I and III of the opinion and the mandate and files a concurring opinion.

Justice Donohue joins Parts I and II of the opinion and the mandate and files a concurring opinion.

Justice Baer joins Parts I and III of the opinion and files a concurring and dissenting opinion, joined by Justice Dougherty.