**[J-50-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | |
|---|---|
| JASMINE WEEKS, ARNELL HOWARD, PATRICIA SHALLICK, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | : No. 22 EAP 2021<br>:<br>:<br>: Appeal from the order of the<br>: Commonwealth Court dated May 13,<br>: 2021 at No. 409 MD 2019. |
| Appellants | :<br>: ARGUED:  September 14, 2022 |
| | : |
| v. | :<br>:<br>:<br>: |
| DEPARTMENT OF HUMAN SERVICES OF THE COMMONWEALTH OF PENNSYLVANIA, | :<br>:<br>:<br>: |
| Appellee | :<br>: |

**OPINION**

**CHIEF JUSTICE TODD**                    **DECIDED:  September 28, 2023**

Article III of the Pennsylvania Constitution, through a constellation of provisions, ensures a transparent, orderly, and understandable process by which legislation is passed into law in our Commonwealth.  It accomplishes these goals by imposing certain foundational requirements, and placing certain basic prohibitions, on the legislative process.  More specifically, Article III, Section 1 mandates that a law be passed through a bill and prohibits the bill's original purpose from being changed on its passage through the Senate or the House of Representatives.[1]  Similarly, Article III, Section 3 requires that

---

[1] Article III, Section 1, entitled "Passage of laws," provides in full as follows:

(continued…)

proposed legislation be contained in a single subject, and that that subject be clearly expressed in a title.[2]  In this direct appeal, we consider a class action challenge to the constitutionality of Act 12 of 2019 ("Act 12"),[3] which, *inter alia*, enacted changes to the Pennsylvania Human Services Code.[4]  In particular, we must determine whether the lawmaking which culminated in the passing of Act 12 satisfied Article III's requirements.[5]  For the reasons set forth below, we hold that the process by which the General Assembly passed Act 12 satisfied both the "original purpose" and "single subject" mandates found in Article III of our Constitution.  Thus, we affirm the order of the Commonwealth Court and find the statutory enactment to be constitutional.

## I.  Factual and Procedural History

To fully analyze the constitutional questions presented by this appeal, a review of the background of Act 12 is required.  Central to the current dispute regarding Act 12 is the General Assistance cash assistance ("Cash Assistance") program, which was created

---

> No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

Pa. Const. art. III, § 1.

[2] Article III, Section 3, entitled "Form of bills," provides in its entirety:

> No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

Pa. Const. art. III, § 3.

[3] Act of June 28, 2019, P.L. 43.  The Human Services Code was formally entitled the Public Welfare Code.

[4] Act of June 13, 1967, P.L. 31.

[5] To be clear, we are considering only the constitutionality of the legislative enactment process by which the General Assembly advanced Act 12, and are not passing upon the propriety of the substantive provisions of this piece of legislation.

in 1967. This state program was administered by Appellee Department of Human Services ("DHS"). DHS was authorized to disburse up to a maximum of $215 in monthly cash assistance grants to individuals who were unable to work and had no other source of income, including those who had physical or mental disabilities; were pregnant; were victims of domestic violence and receiving protective services from DHS; were enrolled in a substance abuse treatment program, which imposed conditions precluding them from working; or were nonparental caretakers of children under the age of 13, or nonparental caretakers of an individual suffering from a physical or mental disability. 62 P.S. § 432. As of July 2019, over 12,000 individuals across Pennsylvania received Cash Assistance benefits. Pennsylvania also provides a General Assistance medical assistance ("Medical Assistance") program which provides state-funded health insurance to individuals in certain categories who do not qualify for the joint federal-state Medical Assistance program.

The Cash Assistance program ceased operation in July 2012 after then-Governor Tom Corbett signed Act 80 of 2012,[6] which, like Act 12, provided for the program's elimination. Several individuals with disabilities who benefitted from the Cash Assistance program, and organizations involved in the delivery of human services, challenged Act 80 by asserting that it violated Article III, Sections 1, 3, and 4[7] of the Pennsylvania Constitution. In July 2018, our Court ruled that the means by which the General Assembly passed Act 80 violated Article III, Section 4 – which requires that all legislation be considered by each house of the legislature on "three different days." *See Washington*

---

[6] Act of June 30, 2012, P.L. 668.

[7] Article III, Section 4, entitled "Consideration of bills," provides in relevant part:

> Every bill shall be considered on three different days in each House.

Pa. Const. art. III, § 4.

*v. Department of Public Welfare*, 188 A.3d 1135 (Pa. 2018) (holding that Article III, Section 4 had been violated because the various provisions of the legislation which became Act 80 were added late in the legislative session to an empty "shell bill," the prior contents of which had been removed and enacted by other legislation, and the added provisions were not considered by each legislative chamber on three separate days, nor were they germane, as a matter of law, to the subject matter of the deleted provisions of the bill, or to each other).[8]

Subsequent to our decision in *Washington*, in August 2018, DHS again began accepting applications for the Cash Assistance program, and, commencing in November 2018, DHS started issuing payments to applicants who met the eligibility criteria. However, in January 2019, a renewed effort was made to eliminate the Cash Assistance program, culminating in Act 12.

As the specific lawmaking process leading to Act 12 is at the core of the instant challenges, it is critical to review that process in some detail. Act 12 began with the introduction of House Bill ("H.B.") 33, Printer's Number ("P.N.") 0047. This bill was entitled:

> Amending the act of June 13, 1967 (P.L. 31, No. 21), entitled "An act to consolidate, editorially revise, and codify the public welfare laws of the Commonwealth," in public assistance, further providing for definitions, for general assistance-related categorically needy and medically needy only medical assistance programs and for the medically needy and determination of eligibility.

*Id.* The bill made four changes to the Human Services Code: it terminated the Cash Assistance program; it affirmed that the Medical Assistance program would not be

---

[8] As in this case, our Court denied the challengers' appeal from the Commonwealth Court's denial of a preliminary injunction. *Washington v. Department of Public Welfare*, 76 A.3d 536 (Pa. 2013) (order).

altered;[9] it created a definition of "General Assistance-related categorically needy medical assistance," which concerns medical assistance for certain types of "needy" persons; and it deleted the provision of the Human Services Code which classified an individual as "medically needy" and, thus, eligible for Medical Assistance benefits if he or she received Cash Assistance grants. This bill was considered twice by the full House and then referred to the House Appropriations Committee on March 27, 2019.

The Committee adopted amendments to H.B. 33, P.N. 0047, which was expanded to include revisions to other sections of the Human Services Code and was then denominated H.B. 33, P.N. 2182. These amendments included reauthorization of Nursing Facility Incentive Payments to qualified non-public nursing facilities serving low income individuals, *i.e.*, Medicaid patients — which were due to expire on June 30, 2019 — until June 30, 2020, and, as an incentive for such facilities to accept more Medicaid patients, doubled the amount of these payments from $8 million to $16 million.[10] The

---

[9] Specifically, Section 2 of Act 12, Section 403.2 of the Act, added June 30, 2012 (P.L. 668, No. 80), which was subsequently declared unconstitutional in *Washington*, was reenacted and amended to read:

> Section 403.2. General Assistance-Related Categorically Needy and Medically Needy Only Medical Assistance Programs.--(a) Subject to subsection (b) and notwithstanding any other provision of law, the general assistance cash assistance program shall cease [August 1, 2012] July 1, 2019. (b) The general assistance-related categorically needy medical assistance program shall continue, including, but not limited to, the eligibility and work and work-related requirements under this article. The general assistance-related medical assistance program for the medically needy only shall continue.

[10] The Medicaid program provides federal financial assistance to states choosing to reimburse needy individuals for certain medical expenses. *See* Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396r. Assistance may be provided, however, only to persons deemed to be "medically needy," such that they do not have the income and resources to meet necessary medical costs. *Colonial Park Care Center, LLC v. Department of Public Welfare*, 123 A.3d 1094, 1097 (Pa. Cmwlth. 2015).

amendments also extended assessments on "high volume Medicaid hospitals" in Philadelphia ("Philadelphia Hospital Assessment"), which were set to expire on June 30, 2019, through June 2024, generating funding for low-income individuals. This revenue raising measure draws down matching federal Medicaid dollars through a levy on hospitals and generates over $165 million in revenue annually. H.B. 33, P.N. 2182, Senate Appropriations Fiscal Committee Note (June 20, 2019). Furthermore, the amendments altered the definition of a high-volume Medicaid hospital from a hospital providing over 90,000 days of care to Pennsylvania medical assistance patients to one providing over 60,000 days of inpatient care to such patients. The amendments also expanded the permissible uses by municipalities of the Philadelphia Hospital Assessment by allowing the municipalities to retain a portion of the revenues from those assessments for public health programs, including educational programs to reduce tobacco use and obesity; air pollution monitoring; enforcement of lead-free rental requirements; programs to promote immunization; water quality programs; childhood literacy programs; and the provision of care services in neighborhood health centers. Additionally, the amendments revised the definitions for the Statewide Quality Care Assessments, a program which generates revenue to pay for healthcare for low-income individuals and constitutes a tax on all hospitals statewide, and which permits Pennsylvania to draw down on supplemental Medicaid payments from the federal government.

The following additional language was also added to the title of the bill:

> and for medical assistance payments for institutional care; in hospital assessments, further providing for definitions, for authorization, for administration, for no hold harmless, for tax exemption and for time period; and, in statewide quality care assessment, further providing for definitions.

H.B. 33, P.N. 2182, Title.

The amended bill was reported out of the Appropriations Committee, and it was passed by the full House on June 19, 2019 by a vote of 106-95. It was then sent to the Senate. One week later, after being referred to the Senate Health and Human Services Committee and Appropriations Committee, it was considered by the full Senate three times and passed on June 26, 2019, by a vote of 26-24. Two days later, Governor Tom Wolf signed the bill into law. The bill was published on July 13, 2019, in the Pennsylvania Bulletin by the Legislative Reference Bureau, which designated it Act 12 of 2019, and entitled it "Human Services Code-omnibus amendments." 49 Pa. Bull. 3595. The provisions relevant to the elimination of the Cash Assistance program became effective on August 1, 2019, and the other amendments became effective on July 1, 2019. Thus, Act 12 eliminated the authority of DHS to disburse Cash Assistance benefits to qualified recipients, reaffirmed the continued existence of the Medical Assistance program, as well as effectuated the above changes to the Human Services Code.

On July 22, 2019, Appellants Jasmine Weeks, Arnell Howard, and Patricia Shallick, who were recipients of Cash Assistance benefits, as well as a class encompassing over 12,000 other individuals who were receiving Cash Assistance benefits when they were terminated by the enactment of Act 12 on August 1, 2019, filed a "Class Action Petition for Review" in the Commonwealth Court's original jurisdiction, asserting that Act 12 was passed in violation of Article III, Sections 1 and 3 of the Pennsylvania Constitution.

Because DHS indicated that Act 12 would cause Cash Assistance payments to cease on August 1, 2019, Appellants also sought a preliminary injunction, via an "Application for Special Relief," to enjoin DHS's enforcement of Act 12. In support of their motion for a preliminary injunction, Appellants attached affidavits from Cash Assistance recipients attesting to the harm that they would suffer if this monthly stipend was

terminated, as well as affidavits from social service professionals, public officials, and legal professionals who represent Cash Assistance recipients.

On August 1, 2019, the Commonwealth Court, sitting as trial court, denied Appellants' motion for a preliminary injunction, *Weeks v. Department of Human Services*, No. 409 M.D. 2019 (Pa. Cmwlth. 2019) ("*Weeks I*"), and Appellants lodged an interlocutory direct appeal.[11]

Our Court affirmed in an opinion authored by former-Chief Justice Saylor, which was joined by five other Justices. *Weeks v. Department of Human Services*, 222 A.3d 722 (Pa. 2019) ("*Weeks II*"). We considered the Commonwealth Court's denial of the requested injunction under the appropriate standard of review, which requires that we affirm a lower court if it had "any apparently reasonable grounds" for denying the injunction. *Id*. at 727. However, we also noted the presumption of validity of any enactment of the General Assembly, and the high burden on a petitioner to demonstrate that the enactment clearly, palpably, and plainly violated the Constitution. Beginning with the question of whether Appellants could demonstrate a likelihood of success on the merits, our Court looked to our prior decisions in this area — *City of Philadelphia v. Commonwealth*, 838 A.2d 566 (Pa. 2003) and *Pennsylvanians Against Gambling Expansion* ("*PAGE*"), 877 A.2d 383 (Pa. 2005) — under which we held that an enactment violates Article III, Section 3 if there is "no single unifying subject to which all of the provisions of the act are germane." *Weeks II*, 222 A.3d at 728 (quoting *City of*

---

[11] To obtain a preliminary injunction, a petitioner must establish: (1) relief is necessary to prevent irreparable harm that cannot be adequately compensated by a monetary award; (2) greater injury will occur from the denial of the injunction than from its issuance; (3) the injunction will restore the parties to their status quo as it existed before the alleged wrongful conduct; (4) the petitioner is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and (6) the injunction will not adversely affect the public interest. *Summit Towne Centre, Inc. v. Shoe Show of Rocky Mount, Inc.*, 828 A.2d 995, 1000 (Pa. 2003).

*Philadelphia*, 838 A.2d at 589). The majority continued, offering that our Court deems an Article III, Section 3 violation to occur only when provisions of legislation contain "unrelated subject matter" that cannot be grouped together except under a conceptualized "overly-broad topic" such as the "business of the courts, municipalities, or the economic wellbeing of the Commonwealth." *Id.* at 729 (quoting *PAGE*, 877 A.2d at 596). Applying this standard, the Court reasoned that Act 12 "as a whole relates to the provision of benefits pertaining to the basic necessities of life to certain low-income individuals." *Id.* at 730. The Court explained that "[s]ome of these benefits may be in the form of cash assistance for such items as basic utility services, food, clothing, and personal hygiene products, while others may be supplied through medical or nursing-home care, the delivery of which is incentivized by payments to providers." *Id*. The Court determined that this theme was "both unifying and sufficiently narrow to fit within the single-subject rubric." *Id*. Thus, the Court concluded that the Commonwealth Court did not abuse its discretion in rejecting a preliminary injunction under Article III, Section 3.

Similarly, our Court found this same germaneness test applied to determine whether an enactment violates Article III, Section 1. We noted that the original bill had only three provisions relating to the Cash Assistance program. We opined that the additional sections which became Act 12 all fit within the same unifying topic of "the provision of benefits pertaining to the basic necessities of life to certain low-income individuals." *Id*. Moreover, we emphasized that this was not a situation "in which the original bill was 'gutted' and its 'hollow shell' was then filled with distinct provisions." *Id*. at 731. Indeed, our Court found that the original provisions remained in the bill and all the amendments added to the bill during the legislative process related to this same broad

unifying topic.  Thus, we concluded that the Commonwealth Court did not abuse its discretion in denying a preliminary injunction under Article III, Section 1.[12]

Justice Wecht dissented, opining that the proposed unifying purpose set forth by the majority appeared to him to be "very nearly as broad as the one we characterized in *Washington* as 'entirely too expansive.'"  *Id.* at 744 (Wecht, J., dissenting) (quoting *Washington*, 188 A.3d at 1154 n.36).  In his view, the majority's analysis should have been held in abeyance until there was further development of the record through the normal litigation process, so that the merits of the parties' competing arguments could be more thoroughly developed and considered by our Court.  From Justice Wecht's perspective, "[i]t is not at all clear that there is a common nexus between the subject of the original bill, ending [Cash Assistance] payments, and that of the later amendments, the generation and disbursement of revenue for the provision of health care services, such that they may be considered part of a unifying scheme to accomplish a single overarching purpose discernible in the original bill."  *Id.* at 745.  Thus, he believed a substantial question existed as to whether Act 12 complied with the requirements of Article III, Sections 1 and 3.  Because he also deemed Appellants to have set forth sufficient irreparable harm from the termination of the Cash Assistance program, he would have reversed the Commonwealth Court's denial of their requested preliminary injunction.

Following our decision in *Weeks II*, proceedings continued in the Commonwealth Court.  Appellants filed an amended petition for review in which they added a claim that

---

[12] This author penned a separate concurring opinion in which I indicated that my joinder hinged on the fact that, "[a]t the preliminary stage of this litigation, . . . this Court is not asked to decide [the] ultimate constitutional question" of whether Act 12 violates Article III, Sections 1 and 3.  *Id.* at 731 (Todd, J., concurring).  Rather, because our Court's task involved the more limited inquiry of whether the lower court had "'any apparently reasonable grounds' to support its denial of preliminary injunctive relief," *id.* at 732 (quoting *Summit Towne Center v. Shoe Show of Rocky Mount*, 828 A.2d 995, 1000 (Pa. 2003)), I cautioned that I was withholding judgment on the merits of the underlying constitutional questions.  Justices Donohue and Dougherty joined my concurring opinion.

Act 12 also violated Article III, Section 1 because the amendments to the bill transformed its initial purpose and, consequently in their view, rendered its final title deceptive, in that it failed to adequately apprise legislators of its true purpose. On May 11, 2020, DHS filed preliminary objections and demurred to Appellant's amended petition.

On March 24, 2021, in a unanimous, published opinion and order, the Commonwealth Court sustained DHS's preliminary objections and dismissed Appellants' petition for review in its entirety. *Weeks v. Department of Human Services*, 255 A.3d 660 (Pa. Cmwlth. 2021) ("*Weeks III*").[13] With respect to Appellants' Article III, Section 1 original purpose challenge, the Commonwealth Court noted that, in *PAGE*, our Court explained that, in order to determine whether an Article III, Section 1 violation has taken place, a reviewing court must consider the "original purpose of the bill . . . in reasonably broad terms" and determine whether that purpose has changed in the final bill. *PAGE*, 877 A.2d at 409. The court continued that a reviewing court must "consider, whether in its final form, the title and contents of the bill are deceptive." *Id.* The title of a bill will not be considered deceptive if "[i]t place[s] reasonable persons on notice of the subject of the bill." *Id.* Applying these criteria, the court opined that, "viewed in reasonably broad terms, the original purpose of HB 33 was to amend the Human Services Code's provisions on medical assistance to low-income individuals." *Weeks III*, 255 A.3d at 671. The court reasoned that "[e]ach amendment, even the elimination of the [Cash Assistance] program, pertained to the provision of medical assistance to certain low-income persons." *Id.*

The Commonwealth Court also rejected Appellants' claim that the title of the final bill was deceptive. The court deemed the language in the title of H.B. 33, P.N. 0047 –

---

[13] This opinion was authored by Judge Leavitt, and joined by Judge Leadbetter, as well as then-President Judge, now-Justice, Brobson.

"providing for definitions for general assistance" – to be sufficient to place legislators on notice that "the bill pertained to the provision of medical services to 'categorically needy individuals,'" and apprised them that the Cash Assistance program would be eliminated. In the Commonwealth Court's view, the General Assembly was not required to identify the specific deletions from the Human Services Code that Act 12 would effectuate. *Id.* at 672.

Additionally, relying on the germaneness test set forth in *City of Philadelphia*, *supra*, the court rejected Appellants' Article III, Section 3 single subject challenge because the court considered all of the provisions of Act 12 to pertain to variations of the single unifying subject of "the provision of General Assistance to low-income individuals," and "the provision of 'basic necessities of life to certain low-income individuals.'" *Id.* at 670 (quoting *Weeks II*, 222 A.3d at 730).[14] The court eschewed Appellants' argument that the revenue raising provisions for hospitals and nursing homes added to Act 12 were not germane to the provisions of Act 12 terminating Cash Assistance. In the court's view, the addition of these provisions did not cause the legislation to deviate from this unifying subject.[15] Appellants appealed the Commonwealth Court's decision.

Before our Court, Appellants raise two questions: (1) whether the enactment of Act 12 was in violation of Article III, Section 1 of the Pennsylvania Constitution, because its original purpose changed and its title was deceptive; and (2) whether the enactment

---

[14] The Commonwealth Court also seemingly proffered the unifying subjects of "the provision of health care assistance to certain low-income persons and the eligibility criteria therefor" and "providing services to certain low-income individuals." *Weeks III*, 255 A.3d at 669.

[15] The Commonwealth Court rejected DHS's argument that it should adopt our Court's analysis in *Weeks II in toto*, recognizing that our decision on the denial of the *preliminary* injunction in that case did not constitute a decision on the merits of Appellants' request for a *permanent* injunction. *Id*. at 666. Nevertheless, it indicated that it found our analysis of this issue to be "compelling." *Id.*

of Act 12 violated Article III, Section 3 because its provisions covered more than a single subject. As both issues constitute pure questions of law, our scope of review is plenary, and our standard of review is *de novo*. *Buffalo Township v. Jones,* 813 A.2d 659, 664 n.4 (Pa. 2002). Furthermore, as this appeal arises in the context of a demurrer, which tests the legal sufficiency of the complaint, it is well established that, for purposes of evaluating that sufficiency, a court must accept as true all well-pleaded, material, and relevant facts alleged in the complaint, and inferences that are fairly deducible from those facts. *Commonwealth by Shapiro v. UPMC*, 208 A.3d 898, 909 (Pa. 2019). The question presented in such an analysis is whether, on the facts alleged, the law states with certainty that no recovery is possible. *Id*. Where "a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it." *Id*.

Importantly, facial challenges to the validity of a statute are disfavored. *Commonwealth v. Heinbaugh*, 354 A.2d 244, 245 (Pa. 1976). Indeed, every enactment of the General Assembly is presumed valid – a presumption that extends to the manner in which it was passed. *Commonwealth v. Neiman*, 84 A.3d 603, 611 (Pa. 2013). Thus, a statute will only be stricken if the challenger demonstrates that it "clearly, palpably and plainly violates the Constitution." *Harrisburg School District v. Zogby*, 828 A.2d 1079, 1087 (Pa. 2003) (quoting *Purple Orchid, Inc. v. Pennsylvania State Police*, 813 A.2d 801, 805 (Pa. 2002)); *cf*. 1 Pa.C.S. § 1922(3) (directing courts to assume the legislature does not intend to violate the state or federal Constitutions). Therefore, "[t]he party seeking to overcome the presumption of validity bears a heavy burden of persuasion." *West Mifflin Area School District v. Zahorchak*, 4 A.3d 1042, 1048 (Pa. 2010).

Finally, central to any analysis under Article III, Section 1 or Section 3, amendments to a bill must be germane to and not change the general subject of the bill. Because the germaneness inquiry is more prominent in a Section 3 inquiry, we will reorder

the issues as stated in our grant of allocatur and address Appellants' Article III, Section 3 challenge first.

## II. Challenge under Article III, Section 3

With respect to satisfaction of Article III, Section 3, Appellants contend that, rather than a single unifying subject, the amended bill contained four disparate subjects: (1) the elimination of Cash Assistance benefits; (2) the extension of Nursing Facility Incentive Payments for another year and increasing state funds for those payments; (3) amendments to reauthorize and increase a revenue-raising tax, the Philadelphia Hospital Assessment, and to allow municipalities to use their portion of revenues raised by that assessment for broad "public health programs"; and (4) changes to another revenue-raising tax, the Statewide Hospital Quality Care Assessments, affecting which revenues are subject to that tax. Appellants' Brief at 45. Thus, Appellants posit that, even if our Court could view the amendments as related to medical assistance to low-income individuals (a view with which they disagree), those amendments reflected a change from the original purpose, which involved cash benefits and not health care benefits.

Building on this argument, Appellants highlight that the Philadelphia Hospital Assessment included a change to allow municipalities to use a portion of their raised revenue for broad public health endeavors. These general public health matters included restaurant and retail food inspection, air and water quality, inspection of barber and beauty establishments, and promoting childhood literacy, which, according to Appellants, did not relate to medical care for low-income individuals, and would extend further than merely impacting the basic needs of low-income individuals. Indeed, Appellants aver that DHS concedes that, contrary to the Commonwealth Court's finding, neither the original bill nor the final bill makes any changes to the Medical Assistance program.

Appellants maintain that Act 12 is an omnibus bill in both name and substance and any contention that the "single subject" of the bill is "programs overseen by the [DHS]," is overbroad, as exemplified by our Court's decision in *Washington*, which rejected as the unifying subject of Act 80 "the regulation and funding of human services programs regulated by the Department of Public Welfare." Appellants' Brief at 49 (quoting *Washington*, 188 A.3d at 1153 n.36). Related thereto, Appellants contend that none of the hypothesized proposed subjects used to unify the disparate provisions of the bill allow Act 12 to survive scrutiny under Article III, Section 3. Specifically, Appellants reject "the provision of health care assistance to certain low-income persons" as a unifying theme, as the elimination of Cash Assistance benefits is unrelated to medical assistance. Likewise, the claim that the theme "the provision of General Assistance to low-income individuals" is inapt as the provisions of Act 12 cannot be so unified, noting that "General Assistance" is a term of art comprised of both Cash Assistance benefits and Medical Assistance benefits; none of the amendments to the original bill impacted either of those two programs; and certain of the amendments are not limited to low-income individuals. Appellants' Brief at 50. Moreover, Appellants argue that the subject of "the provision of benefits pertaining to the basic necessities of life to certain low-income individuals" also fails as overly broad, and nevertheless, not all of the pieces of Act 12 can be constitutionally connected even under this moniker, as the Philadelphia Hospital Assessment broadens the purposes for which municipalities may use their portion of the assessment for various public health programs which are not limited to low-income individuals. *Id*.

Finally, Appellants emphasize that Governor Wolf, who supported the revenue measures for hospitals and municipalities, but did not support the termination of the Cash Assistance program, viewed Act 12 as presenting him with a "Hobson's choice" whereby

he was forced to sign the entirety of the legislation in order to secure funding for hospitals, funding which was set to expire within a short period of time at the end of the Commonwealth's fiscal year. Appellants' Brief at 58. Appellants contend that the hospital assessments and nursing facility payments had extensive legislative support, noting that they had easily passed the General Assembly in 2016 when they were last up for reauthorization. Yet, even though those measures could have been enacted as separate legislation, Appellants suggest that they were, instead, combined with the bill to eliminate Cash Assistance in order to secure support among those legislators who might otherwise have opposed the elimination of the Cash Assistance program, had that issue stood on its own. Appellants therefore urge that the Commonwealth Court decision below cannot stand because it countenances the very type of disfavored legislative practice — logrolling — which the framers of Article III, Section 3 intended to prevent.[16]

Initially, DHS responds by stressing the heavy burden upon a challenger to the constitutionality of a statutory provision, and it reminds that our Court should only invalidate a statute that clearly, palpably, and plainly violates the Constitution. DHS emphasizes that our Court, in *PAGE*, in setting forth the required two-prong test to determine whether Article III, Sections 1 and 3 have been violated, allows a reviewing

---

[16] In support of Appellants' position, the American Civil Liberties Union of Pennsylvania, three law professors who are experts in Pennsylvania Constitutional law, and a legal aid attorney, filed an *amicus* brief. *Amici* focus heavily on the historical purposes of Article III, Sections 1 and 3, noting they are required for a proper and transparent government. *Amici* also challenge the Commonwealth Court's analytical approach, asserting that the original purpose rule requires an analysis separate from the single subject rule, and that the single subject rule analysis requires that the court analyze whether the various measures in the bill share a common nexus. Similarly, an *amicus* brief filed by a coalition of nonprofit groups representing various individuals in need, including the Community Justice Project, the Homeless Advocacy Project, the Coalition for Low Income Pennsylvanians, and the Housing Alliance of Pennsylvania, emphasizes that the Cash Assistance program is separate and distinct from the Medical Assistance program, and the General Assembly's characterization of Act 12 as health care-related masks this distinction and the bill's true intent to eliminate Cash Assistance and raise revenue.

court to consider the contents of an initial bill and hypothesize a reasonably broad original purpose from its text, and then compare it with the final version of the bill and determine whether any subsequent amendments added during the legislative process fit within that broad purpose. Second, the court considers whether, in its final form, the title and contents of the bill are deceptive. Here, DHS offers that the original bill discontinued the Cash Assistance program but left unchanged the Medical Assistance program. Thus, according to DHS, the reasonably broad original purpose for this legislation was "to amend existing provisions of the Human Services Code providing medical assistance to low-income individuals," and that the subsequent amendments to the original House bill fit within that broad original purpose because each provision "pertain[ed] to the provision of medical care to certain low-income individuals." Appellee's Brief at 16. Thus, because the original and final bill related to the same broad purpose, DHS contends that the first prong was satisfied.

Related thereto, DHS notes that the Commonwealth Court's suggested initial purpose — regarding "benefits pertaining to the basic necessities of life to certain low-income individuals" — is similarly suitable as a reasonably broad original purpose, and the final bill likewise pertained to this subject. *Id*. at 18. DHS maintains that the modifications the bill underwent between initial and final passage were significantly more "modest" than those in *PAGE*, yet our Court approved the combining of disparate provisions in that case under the broad umbrella of "regulation of gaming," and it submits the instant bill's original and final subjects fit within either its suggested purpose or the Commonwealth Court's hypothesized single subject. *Id*. at 19.

With respect to the second prong, DHS asserts that the title and final version of Act 12 is not deceptive, as the title is not an index of a bill's contents, and, here, it covers all major provisions thereof. Indeed, DHS claims that one cannot credibly argue that the

provisions that eliminate the Cash Assistance program were not adequately noticed or were otherwise hidden in the final bill; in fact, DHS notes, the provisions regarding the Cash Assistance program were part of the original bill.

Thus, when viewed properly, DHS contends that the single subject of the bill did not need to be limited to discontinuing the Cash Assistance program, but pertained to whether health care assistance was to be provided by the Commonwealth to certain low-income individuals, and which low-income individuals would receive that assistance. According to DHS, as each of the amendments to the bill pertained to the provisions of health care for certain low-income individuals, they did not violate the single subject requirement, citing *PAGE* and *Christ the King Manor v. Department of Public Welfare*, 911 A.2d 624 (Pa. Cmwlth. 2006), *aff'd* 951 A.2d 255 (Pa. 2008) (*per curiam*). Indeed, DHS finds *Christ the King Manor* to be "analytically indistinguishable" from this matter and emphasizes the Commonwealth Court's determination therein that the statute did not violate the single subject requirement as it contained the unifying theme of "the regulation of publicly funded health care services." Appellee's Brief at 30.

DHS denies that, simply because some of the provisions in the final bill relating to the raising of revenue or providing benefits to the public at large, this caused the bill to have strayed from its original purpose. According to DHS, all of those provisions still provided benefits to low-income individuals, just as the original bill concerned benefits to low-income individuals. DHS maintains that, just because Act 12's amendments also contain ancillary benefits to the public at large, this does not amount to unconstitutional logrolling, and stresses that the mere fact that lawmakers happen to agree with some, but not all, of the provisions in a bill does not automatically indicate the bill was the result of logrolling, or otherwise render the bill unconstitutional.

With these arguments in mind, we begin our analysis by considering the foundations of Article III, Section 3. While the historical underpinnings of Section 3 are now well traveled in our decisions, and our Court's recent decision in *Washington* set forth an extensive tracing of the origins and legal background of Article III, a condensed summary of that narrative is beneficial to contextualize the issue before us.

During the decade after the Civil War, the citizens of Pennsylvania became increasingly dissatisfied with shortcomings in the legislative process. *Washington*, 188 A.3d 1145. Legislators failed to ensure the transparency of the lawmaking process and disregarded the rules of procedure in acting upon bills, allowing for the passage of laws that benefitted narrow interests and were injurious to the public weal. Specifically, such practices led to "local and special laws to confer special benefits or legal rights to particular individuals, corporations, or groups, benefits which were not afforded the general public; deceptive titling of legislation to mask its true purpose; the mixing together of various disparate subjects into one omnibus piece of legislation; and holding quick votes on legislation which had been changed at the last minute such that its provisions had not been fully considered by members of both houses." *Id*. The public outcry regarding these abuses led to the holding of the 1873 constitutional convention for the dual goals of reformation of the legislative process, including a unified procedure for the passage of all legislation, and the elimination of all special legislation. This effort culminated in the approval in 1874 of the modern version of Article III of the Pennsylvania Constitution. *Id*. at 1146.[17]

---

[17] While Article III, Section 1 has remained unchanged since the 1874 Constitution, Article III, Section 3 was amended in the 1968 Constitution to permit bills to contain multiple subjects if they merely codify or compile existing laws or parts of laws; however, it did not otherwise alter the mandate that legislation contain a single subject. *Washington*, 188 A.3d at 1147.

Article III, Section 3 actually predated the "Reform Constitution" of 1874 and was born from a similar populist uprising during the Civil War regarding the misuse of omnibus bills which incorporated multiple pieces of legislation, each pertaining to a different subject, into one bill. In 1863, the legislature passed what is now Article III, Section 3, which was thereafter approved by the voters in 1864 as an amendment to the 1838 Constitution. *Washington*, 188 A.3d at 1146 n.29. That amendment, virtually identical to the core provision in today's version of Section 3, read: "[n]o bill shall be passed by the legislature, containing more than one subject, which shall be clearly expressed in the title, except appropriations bills." Pa. Const. of 1864, art. II, § 8.[18]

The drafters of Article III, Section 3, who sought a transparent and understandable legislative process, were especially troubled by omnibus bills which permitted the passage of "stealth legislation," by which legislators and citizens were affronted by hidden aspects of legislation. *See* John L. Gedid, *"History of the Pennsylvania Constitution,"* as appearing in Ken Gormley, ed., *The Pennsylvania Constitution A Treatise on Rights and Liberties,* 68 (2004) ("Requiring a single subject and statement of that subject in the title of a bill, as well as controls on altering bills to change their nature during the passage process without revealing the change, prevented 'stealth' legislation in which some legislators might be misled about the contents of a bill, and also enabled the public to know and follow what the legislature was doing.").

Additionally, "logrolling" was of particular concern to the citizenry and the constitutional reformers. This technique "embrac[ed] in one bill several distinct matters, none of which could singly obtain the assent of the legislature, and procur[ed] its passage

---

[18] The 1873 constitutional convention made grammatical changes for clarity; however, the foundational reasons for its original enactment and its restrictions on lawmaking were reaffirmed by the delegates. *Washington*, 188 A.3d at 1146 n.29 (citing 5 Debates of the Constitutional Convention of 1873, 243-46 (1873)).

by combining the minorities who favored the individual matters to form a majority that would adopt them all." *Neiman,* 84 A.3d at 611 (quoting *City of Philadelphia*, 838 A.2d at 586). As a practical matter, this resulted in legislators voting for a bill containing aspects with which they disagreed, solely to secure passage of other parts of the legislation that they supported. As a remedy, the single subject requirement restricted the attachment of riders, which could not be passed on their own, to popular bills which were certain to become law, and constituted a significant step forward in curtailing both stealth legislation and the practice of logrolling.

Related thereto, and while not often discussed in our jurisprudence, an additional salutary purpose served by the single subject requirement is protecting the integrity of the gubernatorial veto: "Just as the single subject limitation seeks to ensure separate and independent legislative consideration of proposals, it is intended to guarantee the same freedom from 'logrolling' during executive review of legislative enactments. Thus . . . if the governor desires to veto any of the sections in the legislation, he would have been required to veto the entire act. To do so requires him to sacrifice desirable legislation in order to veto what he considers undesirable legislation." Robert F. Williams, *The Law of American State Constitutions*, 261-262 (2009); *see also Commonwealth ex rel. v. Barnett*, 48 A. 976, 977 (Pa. 1901) ("[B]y joining a number of different subjects in one bill the governor was put under compulsion to accept some enactments that he could not approve, or to defeat the whole, including others that he thought desirable or even necessary."). Stated another way, "the single subject rule protects the governor's veto prerogative by 'prevent[ing] the legislature from forcing the governor into a take-it-or-leave-it choice when a bill addresses one subject in an odious manner and another subject in a way the governor finds meritorious' . . . . In a word, the single subject rule protects the decision of the legislators and governor on each individual legislative

proposal." Martha Dragich, *State Constitutional Restrictions on Legislative Procedure*, 38 Harv. J. Legis. 103, 115 (2001). Thus, Article III, Section 3 also serves as a safeguard of the Governor's veto power set forth in a parallel constitutional provision. Pa. Const. art. IV, § 15.

Consequently, the reaffirmation of the principles of Article III, Section 3 in the "Reform Constitution" of 1874, limiting each bill to a single subject, served to ensure that every piece of legislation receives a "considered and thorough review" by legislators, and safeguards the ability of all residents of the Commonwealth who will be impacted by a bill to have the opportunity to make their views on its provisions known to their elected representatives prior to their final vote on the measure. *Neiman,* 84 A.3d at 612. Article III, Section 3 was designed to prevent the use of "omnibus bills" which combined multiple pieces of legislation, each pertaining to a different subject, into one bill. *Washington*, 188 A.3d at 1146 (citing Thomas Raeburn White, *Commentaries on the Constitution of Pennsylvania,* xxvi (1907) at 213 (hereinafter "White")). The overarching purpose of these and the other restrictions on the legislative process contained in Article III was to ensure "our Commonwealth's government is open, deliberative, and accountable to the people it serves." *Id.*, at 1147 (citing *City of Philadelphia*, 838 A.2d at 585). Indeed, as we summarized in *PAGE*, "while these changes to the Constitution originated during a unique time of fear of tyrannical corporate power and legislative corruption, these mandates retain their value even today by placing certain constitutional limitations on the legislative process." *PAGE,* 877 A.2d at 394; *see also Stilp v. Commonwealth*, 905 A.2d 918, 951–52 (Pa. 2006).

With this review of its historical origins and purpose, we turn to our analysis of Appellants' Article III, Section 3 challenge. In interpreting a constitutional provision, "we view it as an expression of the popular will of the voters who adopted it, and, thus,

construe its language in the manner in which it was understood by those voters." *Washington*, 188 A.3d at 1149 (citing *Stilp*, 905 A.2d at 939; *Commonwealth v. Harmon,* 366 A.2d 895, 899 (Pa. 1976)). Thus, our Court should not consider constitutional language in a "technical or strained manner, but [should] interpret its words in their popular, natural and ordinary meaning." *Id*. (citing *Scarnati v. Wolf*, 173 A.3d 1110, 1118 (Pa. 2017)). That being the case, "we must favor a natural reading which avoids contradictions and difficulties in implementation, which completely conforms to the intent of the framers, and which reflects the views of the ratifying voter." *In re Bruno,* 101 A.3d 635, 659 (Pa. 2014) (quoting *Commonwealth ex rel. Paulinski v. Isaac,* 397 A.2d 760, 766 (Pa. 1979)). As "[o]ur ultimate touchstone is the actual language of the Constitution itself," *Stilp,* 905 A.2d at 939, we initially turn to the text of Section 3.

Article III, Section 3 of our state charter, commonly referred to as the "single subject" requirement, more precisely contains twin mandates:

> No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

Pa. Const. art. III, § 3; *see also PAGE,* 877 A.2d at 394 (offering that this constitutional provision "sets forth dual mandates for the General Assembly which prohibit the passing of a bill that contains more than one subject and requires that the subject be clearly expressed in its title").

By its express language, Article III, Section 3 could be understood to permit a bill to contain only, and literally, a single subject, meant in its narrowest sense. However, our case law has never given Section 3 such a circumscribed interpretation. Indeed, due to the nature of the legislative process, of which the offering of amendments by legislators or the insertion or deletion of various provisions is a wholly accepted part of the path

through each house of the General Assembly, our Court has strived over the years to strike the appropriate balance between allegiance to the intent and purpose of Article III, Section 3, and, at the same time, to give a broad enough meaning to the provision to allow the legislative process to operate reasonably unimpeded. This endeavor has proven to be complex and does not lend itself to bright-line rules. These characteristics of a single subject analysis, in turn, have resulted in a waxing and waning in how narrowly Section 3 has been construed.

For example, over 100 years ago, in *Payne v. School District of Borough of Coudersport,* 31 A. 1072, 1074 (Pa. 1895) (*per curiam*), our Court explained the expanding and contracting lens through which a single subject analysis may be viewed, and adopted an analytical approach which required the various legislative provisions comprising a bill to accomplish a single general purpose, reasoning that:

> [f]ew bills are so elementary in character that they may not be subdivided under several heads; and no two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough. . . . Those things which have a 'proper relation to each other,' which fairly constitute parts of a scheme to accomplish a single general purpose, 'relate to the same subject' or 'object.' And provisions which have no proper legislative relation to each other, and are not part of the same legislative scheme, may not be joined in the same act.

*Id.* at 1074. This standard has come to be generally described by our Court in more recent cases as a "germaneness" test, which requires a commonality between the provisions contained in the legislation, such that the various parts of the bill can be fairly regarded as working together to accomplish a singular purpose. *Id*.

On the heels of the 1874 Constitution, in the late 19th and early 20th centuries, our Court applied this germaneness construct stringently. *See, e.g., id*. at 1073 (finding legislation that originally related to a single school in Coudersport borough, and which

expanded to "Coudersport and East Fork road district, which includes a part of three townships never therefore connected in any way with Coudersport school district and it affects not merely the graded school, but all the schools within the territory," contained more than a single subject in violation of the Constitution); *Commonwealth ex rel. Woodruff v. Humphrey,* 136 A. 213, 217 (Pa. 1927) (holding statute as written treated two subjects — "engineering" and "land surveying" — not as the latter being a subordinate branch of the former, but as two professions, ultimately setting forth two subjects of legislation in one statute, in violation of Section 3 of the Constitution); *Yardley Mills Co. v. Bogardus*, 185 A. 218 (Pa. 1936) (eschewing unifying subject of "water canals" in striking legislation containing provisions requiring canal companies to maintain waterways, granting these companies the right to sell water for commercial purposes, and allowing the Commonwealth to acquire canal lands by gift and sell portions of them).

More recently, in our 2003 decision in *City of Philadelphia*, we recognized the constitutional mandate that the differing provisions within the bill must be "germane" to each other, although we acknowledged what we have considered germane and not germane has fluctuated throughout the years. *City of Philadelphia*, 838 A.2d at 586-87.[19] Therein, adopting a "middle-course framework," we explained that, to pass constitutional muster under Article III, Section 3, differing subjects contained in legislation must constitute parts of a unifying scheme to accomplish a single purpose. *Weeks II*, 222 A.3d at 727. Our Court's decision was animated by concerns raised earlier in *Payne*, explaining that "[t]here must be limits . . . as otherwise virtually all legislation, no matter how diverse in substance, would meet the single-subject requirement." *City of Philadelphia*, 838 A.2d at 588. Adopting a more moderate approach to Section 3, our

---

[19] Indeed, in *Weeks II*, we described *City of Philadelphia* as "chart[ing] something of a middle course between overly-strict and overly-lenient enforcement of Section 3" and employing a "middle-course framework." *Weeks II*, 222 A.3d at 727, 729.

Court concluded that a bill which made multiple disparate amendments to the Philadelphia City Code could not be brought together under the single broad category of "municipalities," given the various subjects did not "constitute part of a unifying scheme to accomplish a single purpose" and, thus, was unconstitutional. *Id*. at 588-89.[20]

Only two years later, however, our Court authored its arguably broadest interpretation of the single subject requirement in *PAGE*. The Court reiterated that, "'where the provisions added during the legislative process assist in carrying out a bill's main objective or are otherwise 'germane' to the bill's subject as reflected in its title,' the requirements of Article III, Section 3 are met;" but we conceded that, under the teachings of *Payne*, "defining the constitutionally-valid topic too broadly would render the safeguards of Section 3 inert." *PAGE*, 877 A.2d at 395. Nevertheless, the *PAGE* Court found that a bill which originated as a simple measure to allow background checks by the state police for persons involved in harness racing, but to which the entirety of the present Gaming Act was added to it late in the legislative session, including subjects of seemingly diverse topics,[21] did not violate Article III, Section 3. This legislation survived a single

---

[20] These multifarious subjects included authorizing the Philadelphia parking authority to undertake mixed-use development projects and imposing requirements and limitations on the terms and service of parking authority board members; transferring authority over Philadelphia's taxis and limousines from the Public Utility Commission to the Philadelphia Parking Authority; repealing Section 209(k) of the Pennsylvania Intergovernmental Cooperation Authority Act as applied to Philadelphia, as well as restricting the political activities of police officers employed by all municipalities; authorizing all municipalities to hold gifts in trust; imposing a citizenship requirement for board members of municipal business improvement districts; and general bond and indemnification provisions for all municipal authorities and governing bodies.

[21] These provisions regulated the horse-racing industry; authorized the creation of a slot-machine industry in Pennsylvania; created the Gaming Control Board and a regulatory regime therefor; provided for the distribution of licensing fees and tax revenue from casinos; established policies and procedures for gaming licenses for the installation of slot machines; created a general gaming fund for tourism development, property tax relief, and treatment for compulsive gambling; and placed exclusive jurisdiction in the (continued…)

subject challenge, despite the expansive number of different matters in the final bill, because all the topics related to the subject of the "regulation of gaming." *Id*. at 396.

Our Court's decisions in the last decade have reinvigorated a narrower understanding of the single subject requirement, rendering our decision in *PAGE* an outlier. For example, in 2013, in *Pennsylvania State Association of Jury Commissioners v. Commonwealth*, 64 A.3d 611 (Pa. 2013), our Court considered an omnibus bill providing counties with the right to electronically auction surplus farm products and miscellaneous personal property, as well as abolish the office of jury commissioner. We determined that the legislation violated Article III, Section 3 because these subjects could not be grouped together under the broad topic of "powers of county commissioners" or it would contravene the teachings of *Payne* and render nugatory the protections of that constitutional provision. *Id*. at 619 ("The addition of a completely unrelated legislative operation to the bill under the auspices of 'powers of county commissioners' could only have survived the instant single subject challenge 'if the point of view [were] carried back far enough' to eviscerate the rule." (citations omitted)).

Similarly, that same year in *Neiman*, *supra*, our Court struck an omnibus bill which contained Megan's Law sex offender registration provisions, as well as amendments to deficiency judgment procedures, county park police jurisdiction, and the statute of limitations for asbestos claims, as violative of the single subject rule as they were not germane to effectuating a singular purpose. In doing so, our Court rejected as proposed unifying subjects "refining civil remedies or relief" or "judicial remedies and sanctions" as too expansive to satisfy Article III, Section 3's constitutional mandate; rather, we reasoned that "such subjects are virtually boundless." *Neiman*, 84 A.3d at 613.

---

Pennsylvania Supreme Court over gambling license disputes and constitutional challenges to the statute.

Finally, in *Leach*, in a challenge to an omnibus bill that amended the crimes of theft of precious metals and criminal trespass, while also eliminating the right of municipalities to regulate the possession, ownership, or transport of firearms, we found the legislation violated the single subject rule because there was no common nexus to a single purpose — that is, the provisions therein were not part of a unifying scheme to accomplish a single purpose. *Leach*, 141 A.3d at 430. In coming to this conclusion, our Court rejected the assertion that all of the statute's provisions amended aspects of the Crimes Code, as well as the alternative theory that the enactment encompassed Crimes Code amendments involving the regulation of firearms or the ability to own a firearm. *Id*. at 434.

The single subject test, as described above, contains both a "germaneness" and a "clear expression" requirement.[22] As to the "germaneness inquiry," in considering whether the manner of passage of a bill violates Article III, Section 3, a court asks whether the various provisions within the bill are germane to each other. *Neiman*, 84 A.3d 612.[23] The various subjects contained in a legislative enactment are germane to each other if they "have a nexus to a common purpose." *Id.* Alternatively stated, the bill's various provisions must be part of "a unifying scheme to accomplish a single purpose." *Id*. (quoting *City of Philadelphia*, 838 A.2d at 589).

In deference to the legislative process, when engaging in a germaneness analysis, a court may hypothesize a reasonably broad purpose for a bill that encompasses the original text and amendments thereto, regardless of whether that hypothesized subject is proposed by the party defending the constitutional challenge or is conceived by the court.

---

[22] As to the second part of the Article III, Section 3 analysis, whether the subject was clearly expressed in its title, we note that Appellants have not raised a clear title challenge. Appellants' Reply Brief at 9.

[23] As we discuss below, our Court utilizes the same germaneness test in considering compliance with Article III, Sections 1 and 4. *Washington*, 188 A.3d at 1151; *Stilp*, 905 A.2d at 959; *PAGE*, 877 A.2d at 410.

However, when the court must hypothesize an "unduly expansive" subject to sustain an enactment, the General Assembly has violated its constitutional mandate. *Washington*, 188 A.3d at 1152; *City of Philadelphia*, 838 A.3d at 588 (cautioning that "otherwise virtually all legislation, no matter how diverse in substance, would meet the single-subject requirement" undercutting Section 3's safeguards); *see also Weeks II*, 222 A.3d at 738 (Wecht, J., dissenting).

Applying the germaneness inquiry to the legislation before us, we conclude that the provisions contained in Act 12 are germane to each other, as we have interpreted that requirement. As we explained in *Weeks II*, the essence of the decisions analyzed above is that a bill will be held to violate the single-subject rule only if it includes provisions with "unrelated subject matter." 222 A.3d at 729. Of course, the hypothesized unifying topic cannot be overly broad, as illustrated by such rejected topics as the "business of the courts, municipalities, or the economic wellbeing of the Commonwealth" – expansive topics "which would empty the germaneness test of all meaning." *Id*. (citations omitted).

While strong arguments have been made on both sides, and while we find this to be a close case, we conclude that the provisions of Act 12 are not so far removed from each other that they are "unrelated," or that sanctioning their inclusion together would strip the germaneness test of meaning. Rather, as in *Weeks II*, we believe that the act as a whole has a "nexus to a common purpose," *Neiman*, 84 A.3d at 612 — that is, hypothesizing a reasonably broad purpose, we find its provisions all relate to benefits pertaining to the basic necessities of life to low-income individuals. *See Weeks II*, 222 A.3d at 730. [24] This unifying single subject covers the elimination of Cash Assistance,

___

[24] We recognize that our Court in *Weeks II* accepted this unifying theme under the "highly deferential" standard of review pertaining to preliminary injunctions, which required affirmance of the Commonwealth Court's order if there were "any apparently reasonable grounds" for the Commonwealth Court denying the injunction. 222 A.3d at 727. We are (continued…)

which provided cash for basic items such as utility services, food, clothing, and personal hygiene products, as well as the continued provision of Medical Assistance benefits and nursing-home care, the delivery of which is incentivized by payments to providers and benefits to those institutions which serve Medicaid patients.[25]  Furthermore, we find that, although Act 12's amendments additionally addressed ancillary benefits to the populous at large — through municipal funding of public health programs, including educational programs to reduce tobacco use and obesity; air pollution monitoring; enforcement of lead-free rental requirements; programs to promote immunization; water quality programs; childhood literacy programs; and the provision of care services in neighborhood health centers — they still fall within the unifying single subject of "the provision of benefits pertaining to the basic necessities of life for low-income individuals." Similarly, and because of this common subject, the amendments do not amount to unconstitutional logrolling.  Rather, Act 12 in its original form and as amended has a unifying scheme to accomplish a singular purpose.

Additionally, we conclude that "the provision of benefits pertaining to the basic necessities of life to low-income individuals" is not unreasonably broad.  Indeed, this subject is far narrower than the all-encompassing topics such as "municipalities" (*City of Philadelphia*), "refining civil remedies or relief" or "judicial remedies and sanctions" (*Neiman*), "amendments to the county code" or "powers of county commissioners" (*Jury*

not, however, precluded from coming to a similar conclusion – that is, utilizing a similar unifying theme – at this merits stage.

[25] Nevertheless, we respectfully disagree with DHS to the extent it suggests Act 12 passes single subject scrutiny because all of its provisions concern the provision of *medical* benefits to low-income persons.  We agree with Appellants that the Cash Assistance benefits were *not* medical benefits or medical care, and it was not a medical benefit or health care program.  Thus, contrary to DHS's assertion, the original purpose of Act 12 is unrelated to the providing of *medical* benefits to low-income people; however, it passes constitutional muster, as the provisions contained therein all relate to benefits pertaining to the basic necessities of life to low-income individuals.

*Commissioners*), or "regulation of firearms" or "ability to own a firearm" (*Leach*) which we have rejected over the years as unconstitutional. Those pieces of legislation contained provisions on disparate topics that simply could not be reconciled under even a broad hypothesized single subject. Indeed, unlike these cases, here, all of the amendments pertain to benefits for low-income individuals. It is also narrower than the subject — "the regulation and funding of human services programs regulated by the [DPW]" — about which we expressed skepticism in our prior decision in *Washington*, 188 A.3d at 1154 n.36, albeit in the context of an Article III, Section 4 challenge.

Again, we conclude this appeal presents a close call, and find it is at the very boundary of what is permissible under the single-subject mandate in Article III, Section 3. That being the case, we repeat that facial challenges to the validity of a statute are disfavored and every legislative enactment, including the process by which a bill becomes law, is presumed valid. Ultimately, we find that Appellants have not met their heavy burden of establishing that the legislative process "clearly, palpably and plainly" violated our Constitution. *Zogby*, 828 A.2d at 1087. For these reasons, we hold that the legislative process which culminated in the passage of Act 12 satisfies the single subject mandate of Article III, Section 3.

### III. Challenge under Article III, Section 1

Having found that the legislative process which led to the enactment of Act 12 did not violate Article III, Section 3, we turn to the question of whether its enactment was in violation of the requirements of Article III, Section 1 of the Pennsylvania Constitution. As we discuss *infra*, this provision contains twin mandates: (1) that, on its passage through the legislature, a bill is not to be altered or amended so as to change its original purpose; and (2) that the title and contents of the bill in its final form are not deceptive. We address each mandate in turn.

## A. Original Purpose

Appellants begin with an overview of Article III and the history and policy underlying that provision, as set forth above, emphasizing the origins of the amendments to Article III, including the corrosive effects of the last-minute consideration of important measures, logrolling, mixing substantive provisions in omnibus bills and the attachment of unrelated provisions in the amendment process. Appellants' Brief at 23 (citing *City of Philadelphia*, 838 A.2d at 588-89). Specifically, Appellants proffer that the original purpose rule was intended to abolish the addition of riders to bills during the legislative process so as to prevent the addition of proposed legislation on a subject matter unrelated to that of the bill as originally passed.

Appellants explain that, central to an analysis under Article III, Section 1, amendments to a bill must be germane to, and not change, the general subject of the bill. Appellants assert that the Commonwealth Court erred when it held that the purpose of the original bill was to amend the Human Services Code's provisions on Medical Assistance. Rather, Appellants stress that, as sponsored and summarized, the sole stated purpose of the bill, as reflected in its title and text, was to eliminate the Cash Assistance program *without* changing the Medical Assistance program, which, according to Appellants, is a completely different type of benefit. With respect thereto, Appellants maintain that, prior to the passage of Act 12, the Cash Assistance program provided only cash benefits, which, as noted above, are small amounts of cash given to needy individuals who may spend it on a variety of basic life needs, including rent and food. This, according to Appellants, can be contrasted with Medical Assistance, which, as its name suggests, provides medical benefits to eligible individuals, through the Commonwealth's Medical Assistance program (albeit not the broader health care assistance provided through the federal Medicaid program).

In support of its assertion that the original bill's purpose solely related to Cash Assistance, Appellants contend that the original bill's change in the definition of "General assistance" to "General assistance-related categorically needy medical assistance" was necessary because of the elimination of the cash benefits provided by the Cash Assistance program. Appellants' Brief at 31. Appellants submit that, formerly, the receipt of such cash benefits automatically enabled the recipient to receive medical assistance through the Medical Assistance program, but, since the bill was eliminating cash benefits, a further technical revision was necessary to remove this trigger provision. Appellants assert that these "purely technical" references related only to the state-funded Medical Assistance program, and not to the federally-funded Medicaid program, and, thus, not to the Philadelphia Hospital Assessments and Nursing Facility Incentive Payments. Appellants' Brief at 32-33. Indeed, Appellants emphasize that the DHS admitted that the Medical Assistance program was not affected by Act 12.

Appellants submit that the bill's amendments were designed to achieve purposes beyond the elimination of Cash Assistance (its sole original purpose, according to Appellants). Indeed, Appellants assert that the final bill: (1) reauthorized the Nursing Facility Incentive Payments; (2) revised definitions for the Statewide Quality Care Assessment, a tax on hospitals statewide that permitted Pennsylvania to draw down on supplemental Medicaid payments from the federal government; (3) reauthorized the Philadelphia Hospital Assessment, permitting Pennsylvania to draw down $165 million in revenue from the federal government; and (4) changed the Philadelphia Hospital Assessment to permit municipalities to use their portion of revenues raised by that assessment for "public health programs." Appellants' Brief at 35.

Thus, contrary to the Commonwealth Court's conclusion, Appellants maintain that the original purpose of the bill was not "to amend the Human Services Code's provisions

on medical assistance to low-income individuals," but was solely to eliminate the Cash Assistance program. *Id*. Similarly, Appellants reject as an original purpose "medical assistance to low-income individuals," *id*., given that the amendments concerned revenue assessments crucial to the budget, and the Philadelphia Hospital Assessment was altered to allow municipalities to use the generated revenues for broad public health programs, including restaurant and retail food inspection, air and water quality, and inspection of barber and beauty establishments, and promoting childhood literacy. *Id*. at 36. Appellants contend that these uses do not relate to medical care for low-income individuals, and impact more than the basic needs of low-income individuals. Appellants eschew as an original purpose the "provision of benefits pertaining to the basic necessities of life to certain low-income individuals," asserting it is overly broad, and, thus, fails the germaneness test. *Id*. According to Appellants, even under a reasonably broad view of the original purpose of the bill, it could not encompass the "multiple and wide-ranging disparate purposes of the final, amended bill." *Id*. at 37. Appellants submit that our Court rejected such amendments regarding different programs in *PAGE*, *Washington*, and *Leach*.

After setting forth the "extremely deferential" standard of review regarding the constitutionality of Act 12, DHS counters that, with respect to the original purpose requirement, a court must look at the original purpose broadly, Appellee's Brief at 13 (citing *PAGE*, 877 A.2d at 409), reflecting that legislation often changes significantly during its path to becoming law. Here, DHS maintains that the final bill had the same broad purpose as the original bill. Specifically, DHS offers that the original purpose of the bill, broadly stated, was "to amend existing provisions of the Human Services Code providing medical assistance to low-income individuals." Appellee's Brief at 16. According to DHS, the final bill likewise amended existing provisions of the Human

Services Code, pertaining to the provision of medical care to low income individuals, by "(1) extending and increasing funding for certain nursing facilities that provide medical care to low-income individuals; (2) amending the definitions to the Statewide Quality Care assessment (otherwise referred to as the statewide hospital assessment), which authorizes an assessment on hospitals to generate funding to pay for health care services to low-income individuals; and (3) renewing and extending the Philadelphia Hospital Assessment through June 30, 2024, which authorizes an assessment on Philadelphia hospitals to generate funding to pay for health care services for low-income individuals." *Id.* at 16-17. Thus, DHS contends that the original purpose test is satisfied.

Related thereto, DHS notes that its proffered broad purpose is not definitive, as it is for the courts to hypothesize a reasonably broad purpose, not the litigants. Thus, DHS points to the similarly broad purpose we hypothesized in *Weeks II*, concluding that the provisions of Act 12 all concerned "benefits pertaining to the basic necessities of life to certain low-income individuals." *Weeks II*, 222 A.3d at 730. Regardless of which purpose is hypothesized — the one it proffers, or our formulation in *Weeks II* — DHS contends that both pass the constitutional requirements of Article III, Section 1. In support thereof, DHS offers that the amendments in the final bill were significantly narrower than those in *PAGE*, which began as a bill intended for police background inspection in the horse racing industry and expanded to include the authorization of slot machine gambling in the Commonwealth. While the amendments were significant, our Court nevertheless found no violation of Article III, Section 1 as both the original and final form of the bill related to the same broad purpose — the regulation of gaming — and, thus, satisfied the original purpose test.

Our analysis begins with the language of Article III, Section 1. This constitutional provision, entitled "Passage of laws," provides: "No law shall be passed except by bill,

and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose." Pa. Const. art. III, § 1.

As noted by the parties, Article III, Section 1 was newly adopted by the 1873 constitutional convention and was primarily intended to abolish the practice of attaching "riders" to bills during the legislative process by preventing amendments on a subject matter unrelated to that contained in the bill as originally introduced. *Washington*, 188 A.3d at 1146 (citing White at 211). Its objective was to give legislators considering a bill sufficient notice of all of its provisions so that "they might vote on it with circumspection." *Consumer Party of Pennsylvania v. Commonwealth,* 507 A.2d 323, 334 (Pa. 1986).

All parties agree that *PAGE* sets forth the relevant inquiry for a challenge to legislation under Article III, Section 1. Therein, we explained that, generally speaking, "the language adopted by the conventioneers, as well as their purpose in adopting Article III, Section 1 counsel towards, and are best served by, an analytical construct that involves comparison between the original purpose and the final purpose of the bill[]." *PAGE*, 877 A.2d at 408. Notably, the *PAGE* Court set forth a two-prong test. First, a reviewing court must consider the original purpose of the legislation "in reasonably broad terms," compare it to the final purpose, and then decide whether there has been an alteration or amendment that changed the original purpose. Second, the court must consider whether the title and contents of the bill in its final form are deceptive. If the legislation "passes both the purpose comparison and deception inquiries, it will pass constitutional muster." *PAGE,* 877 A.2d at 409; *Stilp*, 905 A.2d at 956.

Additionally, in an original purpose inquiry, a court looks at that original purpose broadly. *PAGE*, 877 A.2d at 409. This is reflective of the reality that legislation changes significantly as it proceeds through the House and Senate, and, indeed, is fully expected to do so. *Id*. (acknowledging "the 'expectation' that legislation will be transformed during

the enactment process"). Furthermore, our Court looks at the original purpose broadly out of deference for legislative matters and respect for the corollary presumption that legislation is constitutional. *Id*. (offering that "our Court is loathe to substitute [its] judgment for that of the legislative branch under the pretense of determining whether an unconstitutional change in purpose of a piece of legislation has occurred during the course of its enactment"). It is for these reasons that a court is free to hypothesize a reasonably broad original purpose in the initial bill and determine whether there has been an alteration or amendment that changed the original broad purpose. *Id*.

As with the Article III, Section 3 challenge, we believe this to be a close case and the parties have supplied reasonable arguments in support of their respective positions. Viewed in reasonably broad terms, the original purpose of Act 12 was to eliminate Cash Assistance while favoring health-specific benefits for low-income individuals, as evidenced by the Human Services Code's provisions which eliminated the Cash Assistance program and reaffirmed the continuance of the Medical Assistance program for low-income individuals. Now we must compare this original purpose of the legislation to the final purpose, and then determine whether there has been an alteration or amendment that changed the original purpose. *PAGE*, 877 A.2d at 409. While the amendments made to the original bill were extensive, as recognized above, the central objective of the legislation remained to "eliminate Cash Assistance while favoring health-specific benefits for low-income individuals." The purpose of both the original bill and the final bill is the same. Thus, we find that Appellants have not met their heavy burden of establishing that Act 12 violates Article III, Section 1's original purpose requirement.

### B. Deceptive Title

Turning to the second prong of the construct announced in *PAGE,* we must consider whether the title of the final bill (relative to the bill's contents) was deceptive.

Appellants claim that it was. Appellants offer that a bill is not deceptive if the "title place[s] reasonable persons on notice of the subject of the bill." Appellants' Brief at 39 (citing *PAGE*, 877 A.3d at 409). While the title indicated that Act 12 was amending the Medical Assistance program, Appellants submit that it made no changes to the Medical Assistance program other than technical changes to accommodate the elimination of Cash Assistance. Indeed, Appellants emphasize that, both in the original and final form, the title did not reference the elimination of the Cash Assistance program in any way. As a result, Appellants contend that the title was deceptive. In this vein, Appellants challenge the Commonwealth Court's assertion that legislators were placed on notice that the bill pertained to the provision of medical services to categorically needy individuals, as the bill made no changes to the Medical Assistance benefits.

In support thereof, Appellants point to case law from other states wherein courts struck legislation for defective titles. *See*, *e.g.*, *City of Helena v. Omholt*, 468 P.2d 764, 767-69 (Mont. 1970) (finding title deceptive where the title contained a statement regarding a certain distribution method while the body of the legislation contained no such method); *Warren v. Walker*, 71 S.W.2d 1057, 1059 (Tenn. 1934) (determining the repeal of certain legislation mentioned in the title only affected one county, and, thus, was defective because it did not give notice that only one county was the subject of the legislation); *Warren, Coutieri v. City of New Brunswick*, 44 N.J.L. 58, 59 (N.J. 1882) (holding title defective where the title spoke to the regulation of salaries of city officers in cities of the state, although the bill only applied to the city of New Brunswick). Here, according to Appellants, the title of the bill at all times omitted the critical information that the bill eliminated, or even related to, Cash Assistance. Thus, Appellants aver that Act 12's title was defective in violation of Article III, Section 1.

For its part, DHS argues that Appellants are contending for the first time that the final version of Act 12 was deceptive because it disguised the fact that the legislation eliminated Cash Assistance. According to DHS, the title was sufficiently detailed, covering all major provisions of Act 12, such that no reasonable person would have been deceived by what was contained in the bill, and that legislators were put on notice that the legislation pertained to the provision of medical services to categorically needy individuals. DHS rejects Appellants' contention to the contrary as incredible. Further, DHS contends that the contents of the original and final bills were well-advertised and robustly debated, reflecting no intent to deceive and pointing out that there is no allegation that any lawmaker, or any individual, did not have reasonable notice of the contents of Act 12. Indeed, DHS submits that this was not an instance, as in *Washington*, where the original bill was "gutted" and became a "hollow shell" which was filled with distinct provisions. *See Weeks II*, 222 A.3d at 731 (discussing *Washington*). Thus, DHS argues that, here, both the spirit and the letter of Article III, Section 1 was satisfied.

We begin our analysis by quoting the final title for Act 12. It stated, in full:

> An Act amending the Act of June 13, 1967 (P.L. 31, No. 21), entitled "An Act to Consolidate, Editorially Revise, and Codify the Public Welfare Laws of the Commonwealth," in public assistance, further providing for definitions, for general assistance–related categorically needy and medically needy only medical assistance programs, for the medically needy and assistance programs, for the medically needy and determination of eligibility and for medical assistance payments for institutional care; in hospital assessments, further providing for definitions, for authorization, for administration, for no hold harmless, for tax exemption and for time period; and, in statewide quality care assessment, further providing for definitions.

H.B. 33, 2019 Leg., Reg. Sess. (Pa. 2019).

As noted by the parties, we must consider whether, in its final form, the title of the bill was deceptive. *PAGE*, 877 A.2d at 408-09. Whether the deceptive title requirement is met is a question of notice. *See Scudder v. Smith,* 200 A. 601, 604 (Pa. 1938) (offering that Article III, Section 1 is "to put the members of the Assembly and *others interested, on notice,* by the title of the measure submitted, so that they might vote on it with circumspection." (emphasis original)). As with Article III, Section 3, Article III, Section 1 was not intended to overwhelm legislators with excessively precise and picayune standards for drafting a bill's title. *Cf. Commonwealth v. Stofchek*, 185 A. 840, 843 (Pa. 1936) ("[Article III, Section 3] was not intended to exercise a pedantic tyranny over the grammatical efforts of legislators, nor to place them between the horns of a constructional dilemma, namely, that the title of an act must be so general or so particularized as to include all of its subject-matter, and yet not so general as to give no indication of its purpose, nor so particular as to inferentially exclude from its scope any items inadvertently omitted."). Indeed, the intent of the constitutional mandate is "to prevent fraudulent efforts to sneak legislation past unknowing legislators or the Governor. . . . In short, as difficult as it may be to have a statute declared unconstitutional for failing to clear the low fence of germaneness, it is that much harder to set aside a statute for the reason that it moved through the legislative process under a deceptive title." *DeWeese v. Weaver*, 824 A.2d 364, 372 n.15 (Pa. Cmwlth. 2003).

We find that the final title of Act 12 was not deceptive. While the amendments to Act 12 were substantive and expansive, its final title placed a reasonable person on notice that the bill concerned benefits pertaining to the basic necessities of life to low-income individuals. *See PAGE,* 877 A.2d at 406. To satisfy Article III, Section 1, the title did not have to identify language that would be stricken from the Human Services Code, as "[t]he title serves as a signal not a précis of the bill's contents." *DeWeese*, 824 A.2d at 372.

The fact that the legislature could have chosen more precise language in the title of the bill does not demonstrate deception. Moreover, we reiterate that a statute must be upheld unless it clearly, palpably, and plainly violates the Constitution. Under that standard, we cannot find the title of the final bill was deceptive in violation of Article III, Section 1.

Accordingly, having found that the amendments to Act 12 did not change the original purpose of the bill, and that its title was not deceptive, we must reject Appellant's Article III, Section 1 challenge.

The order of the Commonwealth Court is affirmed.

Jurisdiction relinquished.

Justices Dougherty and Mundy join the opinion.

Justice Dougherty files a concurring opinion.

Justice Mundy files a concurring opinion.

Justice Donohue files a dissenting opinion.

Justice Wecht file a dissenting opinion.

The Late Chief Justice Baer did not participate in the decision of this matter.

Justice Brobson did not participate in the consideration or decision of this matter.